JOANOS, Judge.
Appellants Northwestern, Inc. (Northwestern) and United States Fidelity and Guaranty Company (USF & G) appeal a final judgment which awarded retainage, costs, and attorney’s fees to appellee Ward Land Clearing and Drainage, Inc. (Ward). *616 Appellants raise four questions for our review: (1) whether Ward was entitled to judgment for retainage under its subcontract with Northwestern; (2) whether Ward was entitled to an award of attorney’s fees; (3) whether Ward should be required to pay a proportionate share of the Gulf Asphalt judgment after Northwestern prevailed on its counterclaim; and (4) whether Northwestern and USF & G were entitled to attorney’s fees and costs as the prevailing party on the novation question and counterclaim. We affirm in part and reverse in part.
Northwestern, defendant in the trial court proceeding, was awarded a prime contract by the Bay County Board of County Commissioners to install sewer treatment plants, lift stations, and sewer lines in the City of Parker. On January 30, 1981, Northwestern subcontracted a portion of the Parker work to Ward,[1] plaintiff in the trial court proceeding. The contract between Northwestern and Ward provided, inter alia, that (1) Northwestern would pay Ward an agreed upon sum, (2) subject to additions and deductions for changes agreed upon in writing, (3) payment would be based on the actual measured installed quantities, and (4) a 10% retainage would be withheld from each estimate of work performed. In addition, the subcontractor Ward was to submit applications for payment to the general contractor Northwestern on a scheduled basis so the general contractor could apply to the owner Bay County for payment.
Once the sewers were installed, the original contract called for an 8-inch shell base material and a lVk-inch type S-l asphalt, to bring the roadway back up to the original paving surface. However, the mayor of Parker wanted the entire street surface paved so the streets would have a uniform appearance. The engineering firm retained by Bay County approached Northwestern and asked the company to come up with a proposal that would accomplish this goal of uniformity.
Over a three or four month period, several proposals were advanced. Northwestern contacted Gulf Asphalt, the firm which had provided Northwestern with data for its original bid. Subsequently there was a meeting attended by the mayor, the county’s engineering consultants, and representatives of Northwestern and Ward. The change finally accepted by the county specified a ¾-inch leveling course and a ½ -inch wearing surface of compacted sand-asphalt hot mix. Gulf Asphalt suggested use of the sand-asphalt hot mix to Northwestern, because it could be put down in a thinner layer than the S-l asphalt.[2]
In December 1981 representatives from Northwestern and Ward met in the offices of Gulf Asphalt. Gulf Asphalt agreed to do the asphalt portion of the work for $25 a ton. This price included delivery to the job site and spreading of the asphalt mix. The record reflects that Northwestern considered Ward’s participation in the conference vital to the project. Since Ward was responsible for a significant portion of the project, Northwestern concluded Ward should have the opportunity to discuss the paving alternatives and prices.
Because Gulf Asphalt did not want two different subcontract agreements for the same job, the parties agreed that Gulf Asphalt would bill Northwestern for the contract total, and Ward would pay its pro rata share to Northwestern. It was further agreed, pursuant to Gulf Asphalt’s request, that Northwestern and Ward would have a representative in their respective areas to sign truck tickets for the asphalt as it was delivered.
In January and February 1982, Gulf Asphalt delivered the material to the job site. Northwestern and Ward each had a representative present at the site to sign the truck tickets. Mr. Adams and Mr. Chavis *617 signed for Northwestern; Mr. Adams (of Northwestern) signed for Ward on two days, then Mr. Pitts signed for Ward.
In January 1982, Gulf Asphalt’s work was satisfactory. In February 1982, however, both Mr. Pitts of Ward and Mr. Chav-is of Northwestern became concerned about the amount of asphalt put down by Gulf Asphalt. A field inspector for Bay County testified that Mr. Pitts checked Ward’s section more frequently than Mr. Chavis checked Northwestern’s section. The field inspector was on the job to assure minimum compliance with contract specifications with regard to thickness of the asphalt. According to the field inspector, if the respective contractors had not had representatives on the scene, he would have done something to halt the manner in which Gulf Asphalt applied the surfacing material.
In late February 1982 the last asphalt was put down. Ward considered the work complete, although it did conduct general clean up and air testing in March 1982. In September 1982 Bay County formally accepted the work as complete. The warranty period ran for one year after acceptance. The record reflects that Ward performed some warranty work after acceptance.
On March 2, 1982, Gulf Asphalt submitted a bill to Northwestern for $123,-143.00, for the Parker project. Mr. Chavis, president of Northwestern, requested a meeting with Gulf Asphalt to discuss the billing. The invoice submitted to Mr. Chav-is indicated 4,925.72 tons of asphalt had been used on the job. This tonnage did not tally with the truck delivery tickets, and the amount billed was more than double the tonnage Northwestern had estimated would be required for the job.
Ward, Northwestern, and Gulf Asphalt met in April 1982, to go over the truck tickets. The correct tonnage was determined to be 3,776.35 tons delivered to the site, with 187.89 tons charged back to Gulf Asphalt as overage. On April 16, 1982, Northwestern received a statement from Gulf Asphalt for 3,588.460 tons at a cost of $89,711.50. At that point, Mr. Chavis was satisfied that 3,588.460 tons had been delivered to the job site but he was convinced the job should have required approximately 2400 tons. He performed random samplings at the job site, and found the asphalt was considerably thicker than the Vi-inch layer agreed upon. Mr. Chavis and Mr. Ward, presidents of Northwestern and Ward respectively, determined the cost of the asphalt actually required for the job should have been $60,000, yet the final bill from Gulf Asphalt was for nearly $90,000. Therefore, Ward and Northwestern decided they would pay only the $60,000, which represented their estimate of the cost for the job.
On June 7, 1982, Mr. Chavis of Northwestern wrote to Gulf Asphalt, stating in part that after receiving a second invoice in the amount of $89,711.50, he made a trip to Panama City and measured the resurfacing and patch work performed by Gulf Asphalt. According to his on-the-site calculations as well as the original calculations, the entire project should have required 2,417.235 tons of asphalt for a total cost of $60,430.88. Northwestern then proposed to. pay Gulf Asphalt $60,430.88 as payment in full for the Parker area project. Gulf Asphalt rejected Northwestern’s proposal, and asserted that Northwestern owed Gulf Asphalt $89,711.50, plus attorney’s fees, interest, and court costs.
On December 23, 1983, Mr. Chavis of Northwestern executed a contractor’s affidavit, representing that with the exception of the pending Gulf Asphalt lawsuit, no subcontract remained unpaid.[3] According to Mr. Chavis, there was at that time no dispute between Ward and Northwestern; although at that time Northwestern owed Ward $10,210 on the original contract and $4,663 on the December 1981 contract, Ward owed Northwestern $23,900.
*618 Subsequently, Gulf Asphalt filed suit against Northwestern for the amount due on the Parker job. The trial court granted summary judgment in favor of Gulf Asphalt. On appeal to this court, the summary judgment was reversed and remanded for trial in Northwestern, Inc. v. Gulf Asphalt, 443 So.2d 508 (Fla. 1st DCA 1984).
On January 12, 1984, Ward filed its complaint against Northwestern and USF & G, Northwestern’s guarantor. In Count I Ward alleged Northwestern owed Ward for retainage, for the novation, for equipment rental, and interest at 12%. In Count II, Ward sought the sums enumerated in Count I from USF & G on its performance bond with Northwestern, plus costs and attorney’s fees.
On February 6, 1984, Northwestern and USF & G filed answer, counterclaim, and third party complaint. As defenses, Northwestern alleged, inter alia, that the suit was filed more than one year after the last work was completed, that Ward failed to complete work under the contract, that Ward failed to invoice for the funds claimed as required by the contract, and Ward failed to pay its proportionate share of the cost of asphalt to Gulf Asphalt. In its counterclaim and third party complaint, Northwestern sought costs incurred in correcting defects which Ward refused to correct within the warranty period, damages accrued by virtue of the suit with Gulf Asphalt, and judgment against Ward’s insurer for damages, costs, and attorney’s fees.
Over Northwestern’s objection, the case was consolidated for trial with the case pending between Gulf Asphalt and Northwestern.
In an order entered April 25, 1985, the trial court found Northwestern owed Ward a total of $29,940.66, and an attorney’s fee of $3,750. The court further found that Ward owed Northwestern $23,725 on the counterclaim, which amount would serve as a set-off against the amount due Ward from Northwestern. The trial court did not award attorney’s fees to Northwestern, because the court found Northwestern had not paid Ward.its pro rata share of the final amount received from Bay County. Final judgment was entered on June 5, 1985, directing Northwestern and USF & G to pay Ward $6,215.66, an attorney’s fee of $3,750, and costs of $139.50, for a total of $10,105.16.
We affirm the first issue raised in this appeal, since we find the evidence supports the finding that Ward was entitled to the final sums due for the project.
Point two concerns the attorney’s fee award to Ward. Since the parties made no provision in their agreement for attorney’s fees, Ward’s entitlement to an attorney’s fee must be found in the statutes. Section 255.05(2), Florida Statutes (1983)[4] requires that an action instituted against the contractor or the surety on the bond must be filed within one year “from the *619 performance of the labor or completion of delivery of the materials or supplies.”[5]
In District School Board of DeSoto County v. Safeco Insurance Company, 434 So.2d 38, 39 (Fla. 2d DCA 1983), the court said:
Under the natural meaning of “performance of the labor” in section 255.05(2), Florida Statutes ..., a certificate of substantial completion and the acceptance of a constructed building by the owner begins the one-year statute of limitations period provided by section 255.05(2) for actions against the surety on the bond.
And in Florida Board of Regents v. Fidelity & Deposit Company of Maryland, 416 So.2d 30 (Fla. 5th DCA 1982), the court held that when an architect certifies a building as substantially completed and the owner accepts the building, “then the contractor is deemed to have fully performed and any lawsuit which could be brought against the surety under the bond must be brought within one year, according to statute.” (Emphasis supplied by the court.)
In the instant case, the record reflects that: (1) work was completed on the Parker project in March 1982; (2) the job was accepted as complete by Bay County in September 1982; and (3) final payment was received by Northwestern in January 1984. Ward’s entitlement to an attorney’s fee required an action to be instituted within one year of completion of the construction project. Clearly, Ward’s suit was not filed timely, therefore the trial court’s award of an attorney’s fee to Ward must be reversed.
Point three concerns the question of Northwestern’s entitlement to contribution from Ward for a pro rata share of the Gulf Asphalt judgment. The record reflects that both Ward and Northwestern believed Gulf Asphalt provided and billed for more asphalt than was required for the Parker project. The record reflects, also, that both Ward and Northwestern agreed to contest the amounts billed by Gulf Asphalt. Northwestern defended the Gulf Asphalt suit and reported to Ward during the course of the litigation. Ward’s president acquiesced in the litigation and contemplated a final settlement between Ward and Northwestern based upon the outcome of the Gulf Asphalt suit.
In ruling on Northwestern’s counterclaim, the trial court found that Ward’s total indebtedness for asphalt delivered to the Parker project amounted to $23,725. Ward performed 26.4% of the work on the Parker project, and the $23,725 figure represents Ward’s cost for 26.4% of the asphalt delivered to the project.
In view of Ward’s participation in the Gulf Asphalt negotiations and Ward’s agreement with Northwestern to contest the Gulf Asphalt billing, we conclude that Ward is now estopped to deny it was a party to the Gulf Asphalt contract. See: Florida State University v. Brown, 436 So.2d 287 (Fla. 1st DCA 1983); Coble v. Lekanidis, 372 So.2d 506 (Fla. 1st DCA 1979); 22 Fla.Jur.2d, Estoppel and Waiver §§ 8, 42. Therefore, we find that Northwestern is entitled to contribution from Ward for its proportionate share of the costs and attorney’s fees awarded to Gulf Asphalt in its litigation with Northwestern.
The final issue concerns Northwestern’s and USF & G’s entitlement to attorney’s fees and costs as the prevailing parties on the counterclaim. Since Northwestern’s counterclaim, like Ward’s suit, was filed after the one year statutory period, there is no basis for an award of attorney’s fees to Ward. Accordingly, we affirm on point four.
Affirmed in part, reversed in part, and remanded for entry of a final judgment consistent with this opinion.
THOMPSON and NIMMONS, JJ., concur.

. The record reflects that Ward contracted to perform 26.4% of the work on the Parker site.

. The final approved written change order was dated April 9, 1982, and received by Northwestern on April 12, 1982. The written change order called for an increase of $21,807.60 in the contract price.

. The contractor's affidavit was a prerequisite to eligibility to receive the final funds due from the county.

. Section 255.05(2), Fla.Stat. (1983), provides:
(2) A claimant, except a laborer, who is not in privity with the contractor and who has not received payment for his labor, materials, or supplies shall, within 45 days after beginning to furnish labor, materials, or supplies for the prosecution of the work, furnish the contractor with a notice that he intends to look to the bond for protection. A claimant who is not in privity with the contractor and who has not received payment for his labor, materials, or supplies shall, within 90 days after performance of the labor or after complete delivery of the materials or supplies, deliver to the contractor and to the surety written notice of the performance of the labor or delivery of the materials or supplies and of the nonpayment. No action for the labor, materials, or supplies may be instituted against the contractor or the surety unless both notices have been given. No action shall be instituted against the contractor or the surety on the bond after 1 year from the performance of the labor or completion of delivery of the materials or supplies.
and § 627.756, Fla.Stat. (1983), provides:
627.756 Bonds for construction contracts; attorney fees in case of suit. — Section 627.428 applies to suits brought by owners, subcontractors, laborers, and materialmen against a surety insurer under payment or performance bonds written by the insurer under the laws of this state to indemnify against pecuniary loss by breach of a building or construction contract. Owners, subcontractors, laborers, and materialmen shall be deemed to be insureds or beneficiaries for the purposes of this section.

. Section 627.428, Fla.Stat. (1983), provides for an attorney's fee to an insured or named beneficiary who prevails in a suit against an insurer,