984 So.2d 478 (2007)
FLORIDA HOSPITAL WATERMAN, INC., etc., Petitioner/Cross-Respondent,
v.
Teresa M. BUSTER, etc., et al., Respondents/Cross-Petitioners.
Notami Hospital of Florida, Inc., etc., Appellant/Petitioner,
v.
Evelyn Bowen, et al., Appellees/Respondents.
Nos. SC06-688, SC06-912.
Supreme Court of Florida.
March 6, 2008.
Rehearing Denied May 12, 2008.
Rehearing Denied June 10, 2008.
*480 Arthur J. England, Jr. and Daniel M. Samson of Greenberg Traurig, P.A., Miami, Florida; and Mason H. Grower, III and Jack E. Holt, III of Grower, Ketcham, Rutherford, Bronson, Eide and Telan, P.A., Orlando, Florida, for Petitioner/Cross-Respondent.
Christopher V. Carlyle, Shannon McLin Carlyle, and Gilbert S. Goshorn, Jr. of The Carlyle Appellate Law Firm, The Villages, Florida, for Respondents/Cross-Petitioners.
Gail Leverett Parenti of Parenti and Parenti, P.A., Miami, Florida, and Andrew Steven Bolin of Macfarlane, Ferguson, and McMullen, Tampa, Florida, on behalf of The Florida Defense Lawyers Association; Stephen H. Grimes and Jerome W. Hoffman of Holland and Knight, LLP, Tallahassee, Florida, on behalf of Florida Hospital Association, Inc.; James M. Barclay of Ruden, McClosky, Smith, Schuster, and Russell, P.A., Tallahassee, Florida, on behalf of Florida Patient Safety Corporation, Inc.; Paul D. Jess, General Counsel of Academy of Florida Trial Lawyers, Inc., Tallahassee, Florida, on behalf of The Academy of Florida Trial Lawyers; and Philip M. Burlington of Burlington and Rockenbach, P.A., West Palm Beach, Florida, and Lincoln J. Connolly of Rossman, Baumberger, Reboso, and Spier, P.A., Miami, Florida, on behalf of Floridians for Patient Protection, Inc., for Amici Curiae.
Steven Wisotsky and Stephen J. Bronis of Zuckerman Spaeder, LLP, Miami, Florida, and Charles T. Shad of Saalfield, Shad, Jay, Lucas, and Stokes, P.A., Jacksonville, Florida, for Appellant/Petitioner.
Thomas K. Equels, J. Stanley Chapman, and Judson H. Orrick of Holtzman Equels, Tallahassee, Florida, for Appellees/Respondents.
Stephen H. Grimes and Jerome W. Hoffman of Holland and Knight, LLP, Tallahassee, Florida, on behalf of Florida Hospital Association, Inc.; Paul D. Jess, General Counsel of Academy of Florida Trial Lawyers, Inc., Tallahassee, Florida, on behalf of The Academy of Florida Trial Lawyers; and Philip M. Burlington of Burlington and Rockenbach, P.A., West Palm Beach, Florida, and Lincoln J. Connolly of Rossman, Baumberger, Reboso, and Spier, P.A., Miami, Florida, on behalf of Floridians for Patient Protection, Inc., for Amici Curiae.
Rehearing Denied May 12, 2008 as to SC06-688.
Rehearing Denied June 10, 2008 as to SC06-912.
PER CURIAM.
These cases are before the Court for review of the decisions of the First and Fifth District Courts of Appeal in Notami Hospital of Florida, Inc. v. Bowen, 927 So.2d 139 (Fla. 1st DCA 2006), and Florida Hospital Waterman, Inc. v. Buster, 932 So.2d 344 (Fla. 5th DCA 2006). Both decisions address the scope of article X, section 25 of the Florida Constitution, a ballot initiative passed by the voters in November 2004 and known as amendment 7, the Patients' Right to Know About Adverse Medical Incidents.[1] The Fifth District in *481 Buster certified three questions of great public importance to this Court, and the First District in Notami Hospital held a statute unconstitutional and certified conflict with Buster. We have jurisdiction. See art. V, § 3(b)(1), § 3(b)(4), Fla. Const.
For the reasons expressed below, we approve in part the decision of the Fifth District holding amendment 7 to be self-executing and we affirm the First District's holdings that the amendment is self-executing and retroactive and its provisions apply to records existing prior to its passage. We also conclude that several subsections of section 381.028, Florida Statutes (2005), conflict with amendment 7 and are therefore unconstitutional, but we sever those provisions and hold that the remainder of the statute is valid.

I. FACTS AND PROCEDURAL HISTORY
Each of these cases addresses amendment 7, approved by the voters on November 2, 2004, and codified as article X, section 25 of the Florida Constitution. The amendment provides:
Section 25. Patients' right to know about adverse medical incidents. 
(a) In addition to any other similar rights provided herein or by general law, patients have a right to have access to any records made or received in the course of business by a health care facility or provider relating to any adverse medical incident.
(b) In providing such access, the identity of patients involved in the incidents shall not be disclosed, and any privacy restrictions imposed by federal law shall be maintained.
(c) For purposes of this section, the following terms have the following meanings:
(1) The phrases "health care facility" and "health care provider" have the meaning given in general law related to a patient's rights and responsibilities.
(2) The term "patient" means an individual who has sought, is seeking, is undergoing, or has undergone care or treatment in a health care facility or by a health care provider.
(3) The phrase "adverse medical incident" means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.
(4) The phrase: "have access to any records" means, in addition to any other procedure for producing such records provided by general law, making the records available for inspection and copying upon formal or informal request by the patient or a representative of the patient, provided that current records which have been made publicly available by publication or on the Internet may be "provided" by reference to the location at which the records are publicly available.
Art. X, § 25, Fla. Const. The effective date and severability provision provides that "[t]his amendment shall be effective on the date it is approved by the electorate." Advisory Opinion to the Att'y Gen. re Patients' Right to Know About Adverse *482 Med. Incidents, 880 So.2d 617, 619 (Fla. 2004) ("Patients' Right to Know").[2] The ballot title for the proposed amendment was "Patients' Right to Know About Adverse Medical Incidents," and the ballot summary accompanying the proposed amendment read as follows:
Current Florida law restricts information available to patients related to investigations of adverse medical incidents, such as medical malpractice. This amendment would give patients the right to review, upon request, records of health care facilities' or providers' adverse medical incidents, including those which could cause injury or death. Provides that patients' identitie [sic] should not be disclosed.
Id.
After the passage of the amendment, the Legislature enacted chapter 2005-265, Laws of Florida, effective June 20, 2005, dealing with the same subject as amendment 7.[3] This is now codified at section 381.028 in the Florida Statutes.
*483 This Page Contains Footnotes.

*484 Buster and Notami Hospital

In each of the cases before us, medical malpractice actions were instituted against the defendant hospitals. During discovery, the plaintiffs sought production of documents in Buster relating to the investigation of the adverse medical incident at issue, and in Notami Hospital, relating to the selection, retention, or termination of Dr. Robert Pendrak, M.D. Each hospital objected, claiming the information sought was confidential pursuant to various statutory privileges existing prior to the passage of amendment 7. In both cases, the trial court rejected these objections and held that amendment 7 was self-executing and applied to existing documents and that any conflicting legislation was subordinate to the constitutional amendment.
The hospitals each sought review by certiorari in the district court, arguing that the trial court's rulings departed from the essential requirements of law. In Buster, the Fifth District agreed with the trial court that amendment 7 was self-executing and allowed for discovery, but disagreed that it could be applied to existing records. 932 So.2d at 356. The First District held in Notami Hospital that amendment 7 was self-executing, that it could be retroactively applied to existing records, and that section 381.028 was unconstitutional. 927 So.2d at 145. The court certified conflict with Buster on the question of retroactivity. Id. The Fourth District subsequently cited and adopted the reasoning of Notami Hospital in North Broward Hospital District v. Kroll, 940 So.2d 1281 (Fla. 4th DCA 2006), finding amendment 7 to be self-executing and retroactive as well as finding section 381.028 to be unconstitutional. Id. at 1282-83. The Kroll court likewise certified conflict with Buster. Id. at 1283.

II. THIS APPEAL
The primary areas of overlap between the two decisions on review involve whether amendment 7 is self-executing and *485 whether it can be applied retroactively, and whether the provisions of section 381.028, Florida Statutes (2005), are constitutional. Accordingly, we address only those issues.

III. GOVERNING LAW and ANALYSIS
Since all of the issues we consider are ones of constitutional or statutory interpretation, this Court's review is de novo. See Zingale v. Powell, 885 So.2d 277, 280 (Fla.2004) ("Although we take into consideration the district court's analysis on the issue, constitutional interpretation, like statutory interpretation, is performed de novo."). In Zingale, while recognizing the fundamental nature of a constitutional edict, we emphasized that the principles governing constitutional interpretation largely parallel those of statutory interpretation. Id. at 282 (citing Coastal Fla. Police Benev. Ass'n v. Williams, 838 So.2d 543, 548 (Fla.2003)).

A. Self-Execution
Both the First and the Fifth Districts below agreed that amendment 7 is self-executing. The Fifth District in Buster cited the definitions provided in the amendment, its relatively narrow purpose to override existing statutory law, and an expressed intent gleaned from its provisions that "existing law was sufficient to implement the provisions of the amendment and that no further legislation was necessary." 932 So.2d at 355. The court also concluded that a contrary decision, finding that the amendment was not self-executing, would frustrate the will of the people, especially since the amendment states it was to be effective upon passage, leaving no time for the enactment of implementing legislation. Id. The First District's reasoning in Notami Hospital largely mirrors that of the Fifth District. The First District cited a presumption that constitutional provisions are self-executing and noted that the amendment "defines, in detail, what records are discoverable, who is entitled to discovery, and states it is effective on the date it is approved by the voters." Notami Hosp., 927 So.2d at 144. We agree with both district courts that amendment 7 is self-executing.
This Court explained the appropriate standard for determining whether constitutional provisions are self-executing in Gray v. Bryant, 125 So.2d 846 (Fla. 1960):
The basic guide, or test, in determining whether a constitutional provision should be construed to be self-executing, or not self-executing, is whether or not the provision lays down a sufficient rule by means of which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment. State ex rel. City of Fulton v. Smith, 1946, 355 Mo. 27, 194 S.W.2d 302. If the provision lays down a sufficient rule, it speaks for the entire people and is self-executing. City of Shawnee v. Williamson, Okl.1959, 338 P.2d 355. The fact that the right granted by the provision may be supplemented by legislation, further protecting the right or making it available, does not of itself prevent the provision from being self-executing. People v. Carroll, 1958, 3 N.Y.2d 686, 171 N.Y.S.2d 812, 148 N.E.2d 875.
Id. at 851. In Gray, the Court found self-executing a constitutional provision providing a formula to determine the number of judges in the judicial circuits, noting the provision laid down "a sufficient rule by which the number of circuit judges which the people have dictated shall be furnished to them may be readily determined without enabling action of the legislature." Id. *486 In reaching this conclusion, we emphasized:
The will of the people is paramount in determining whether a constitutional provision is self-executing and the modern doctrine favors the presumption that constitutional provisions are intended to be self-operating. This is so because in the absence of such presumption the legislature would have the power to nullify the will of the people expressed in their constitution, the most sacrosanct of all expressions of the people.
Id. The importance of ascertaining and abiding by the intent of the framers was emphasized, so that "a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied." Id. at 852. Consistent with our precedent in Gray, we hold that amendment 7 is self-executing and its terms enforceable as of the date of its passage.
We agree with the district courts that the amendment provides a "sufficient rule" by which patients can gain access to records of a health care provider's adverse medical incidents. For example, all key terms are defined within the amendment, including "health care facility," "health care provider," "patient," "adverse medical incident," and "have access to any records." See art. X, § 25, Fla. Const. In addition, the definition provided for the term "have access to any records" indicates that it is to encompass current document production procedures as provided "by general law." Id. Further, as noted above and as emphasized by both district courts, the amendment expressly declares that it is to be effective on passage, indicating that its effectiveness in overriding prior statutory law was not to be dependent upon the enactment of implementing legislation.
The amendment's language makes evident that it was intended to effect an immediate change in the law governing access to medical records without the need for legislative action. While the hospitals contend that a number of relevant and unanswered questions remain regarding the reach of the amendment, we emphasized in Gray that simply because the right conferred by the amendment could be supplemented by legislation does not prevent the provision from being self-executing. 125 So.2d at 851.

B. Application to Existing Records
The question presented here is whether the amendment mandates access to medical records that were in existence at the time the amendment became effective but were previously inaccessible due to restrictive legislative provisions, or whether the prior legislative restrictions continue to bar access to records created prior to the passage of the amendment. Although we will analyze this issue within a retroactivity framework, the use of the word "retroactive" may be somewhat confusing in the context herein since a patient who may have benefited from the right of access now granted obviously cannot go back in time and inform a past decision made about medical care then contemplated.[4] The issue now is whether the amendment *487 permits disclosure of existing records and, if so, whether there is any superseding legal barrier to that disclosure.
In considering this issue, both the First and Fifth Districts cited to Campus Communications, Inc. v. Earnhardt, 821 So.2d 388, 395 (Fla. 5th DCA 2002), which in turn relied on Metropolitan Dade County v. Chase Federal Housing Corp., 737 So.2d 494 (Fla.1999). In Chase Federal, this Court explained:
Two interrelated inquiries arise when determining whether statutes should be retroactively applied. The first inquiry is one of statutory construction: whether there is clear evidence of legislative intent to apply the statute retrospectively. See Landgraf v. USI Film Prods., 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); Hassen v. State Farm Mut. Auto. Ins., 674 So.2d 106, 108 (Fla.1996). If the legislation clearly expresses an intent that it apply retroactively, then the second inquiry is whether retroactive application is constitutionally permissible. See State Farm Mut. Auto. Ins. v. Laforet, 658 So.2d 55, 61 (Fla.1995); State Dep't of Transp. v. Knowles, 402 So.2d 1155, 1158 (Fla. 1981); see also Arrow Air, Inc. v. Walsh, 645 So.2d 422, 425 n. 8 (Fla. 1994).
Chase Federal, 737 So.2d at 499. Accordingly, a retroactivity analysis is two-pronged, asking first if the relevant provision provides for retroactive application, and second if such application is constitutionally permissible.
The First District concluded that the text of the amendment, as well as its accompanying ballot summary and the overall purpose behind the amendment, support the notion that the amendment was intended to provide immediate access to existing records:
Here, the plain language of the amendment permits patients to access any record relating to any adverse medical incident, and defines "patient" to include individuals who had previously undergone treatment. The use of the word "any" to define the scope of discoverable records relating to adverse medical incidents, and the broad definition of "patient" to include those who "previously" received treatment expresses a clear intent that the records subject to disclosure include those created prior to the effective date of the amendment. The effective date merely sets forth the date patients obtained the right to receive the records requested. Because the plain language of the amendment expresses a clear intent that it be applied to include records created prior to its effective date, doing so is not an unconstitutional retroactive application.
Notami Hosp., 927 So.2d at 145. We agree with the district court's succinct analysis of the terms of the amendment as well as its conclusion that the use of these terms indicates the amendment was intended *488 to apply to existing records. Further, based on a plain reading of the ballot summary and the text of the amendment, we agree with the First District that the Florida electorate would have logically assumed this amendment would give patients an immediate right of access to existing medical records.
In Chase Federal, this Court emphasized, "In order to determine legislative intent as to retroactivity, both the terms of the statute and the purpose of the enactment must be considered." 737 So.2d at 500 (emphasis added) (citing State ex rel. Hill v. Cone, 140 Fla. 1, 191 So. 50, 57 (1939)). In that case, this Court looked to the purpose of the Dry Cleaning Contamination Cleanup Act, in addition to the Act's language, to conclude that immunity provisions could be applied retroactively. Id. at 501-02.
Likewise, in the instant case, the purpose of amendment 7 plainly contemplates that its application would provide access to existing records by overriding and supplanting existing statutory provisions that limited access. This Court quoted the amendment's statement and purpose in our opinion approving amendment 7 for the ballot:[5]
1) Statement and Purpose:
The Legislature has enacted provisions relating to a patients' bill of rights and responsibilities, including provisions relating to information about practitioners' qualifications, treatment and financial aspects of patient care. The Legislature has, however, restricted public access to information concerning a particular health care provider's or facility's investigations, incidents or history of acts, neglects, or defaults that have injured patients or had the potential to injure patients. This information may be important to a patient. The purpose of this amendment is to create a constitutional right for a patient or potential patient to know and have access to records of a health care facility's or provider's adverse medical incidents, including medical malpractice and other acts which have caused or have the potential to cause injury or death. This right to know is to be balanced against an individual patient's rights to privacy and dignity, so that the information available relates to the practitioner or facility as opposed to individuals who may have been or are patients.
Patient's Right to Know, 880 So.2d at 618. This language and parallel language in other parts of the amendment and ballot summary make it abundantly clear that the chief purpose of amendment 7 was to do away with the legislative restrictions on a Florida patient's access to a medical provider's "history of acts, neglects, or defaults" because such history "may be important to a patient." Id. In other words, while this history was not previously accessible, it became accessible when the electorate approved a constitutional override of the prior statutory restrictions. The central focus of the amendment was to provide access to records that existed but were not accessible due to statutory restrictions. *489 The language of the amendment could hardly have been more specific or articulate in expressing the intent that what was not accessible before would be accessible with the passage of the amendment.
Similarly, the ballot summary for the amendment reflects that the amendment's clear purpose was to do away with existing restrictions on a patient's right to access a medical provider's history of adverse medical incidents and to provide a clear path to access those records. As noted above, the ballot summary for amendment 7 provided:
Current Florida law restricts information available to patients related to investigations of adverse medical incidents, such as medical malpractice. This amendment would give patients the right to review, upon request, records of health care facilities' or providers' adverse medical incidents, including those which could cause injury or death. Provides that patients' identitie [sic] should not be disclosed.
Id. at 619. The ballot summary, like the text of the amendment itself, clearly expressed an intent to do away with then current Florida law restricting access to this information and would lead voters to the conclusion that all records, including existing records, would henceforth be subject to patient review. The summary indicates that, with the passage of the amendment, there would no longer be any legal barrier to obtaining this information and that a patient, the day after this amendment passed, would have access to this important information of a provider's past record. Because the statutory restrictions constituted the only barrier to production of this information, doing away with the restrictions by constitutional amendment effectively removed the lone obstacle to access. Indeed, in our opinion approving placement of the amendment of the ballot we concluded that it "creates a broader right to know about adverse medical incidents than currently exists." Id. at 623. Accordingly, based on the express language of the ballot summary and the amendment, we find that the plain language of amendment 7 provides for its application to existing records.
We also conclude that the hospital's interpretation of the language and purpose of the amendment would require a strained, if not conflicting, reading of the amendment's language and purpose. The suggestion that a patient seeking information about a medical provider's past record of adverse medical incidents would be limited only to those records made after passage of amendment 7 directly conflicts with the amendment's stated purpose of providing immediate access to such information.[6] Such an interpretation would also effectively leave in force legislative restrictions on access many years after such restrictions were eliminated by the amendment. In effect, this strained reading would postpone any benefits provided by the amendment to a time in the distant future and would leave a permanent gap in the disclosure granted, consisting of the medical provider's history prior to the amendment's passage. Hence, a patient would never actually gain the access plainly *490 promised by the amendment. We reject this strained reading.
The second prong of the retroactivity analysis requires us to examine whether the application of amendment 7 to existing records impacts a substantive, vested right and therefore violates the due process rights of medical providers whose conduct may have been the focus of many of the records to which the Legislature provided only restricted access. See State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 61 (Fla.1995).
In City of Sanford v. McClelland, 121 Fla. 253, 163 So. 513 (1935), this Court articulated the nature of a vested, substantive right. In explaining that the U.S. and Florida Constitutions protect against the impairment of such vested rights, the Court stated, "A vested right has been defined as `an immediate, fixed right of present or future enjoyment' and also as `an immediate right of present enjoyment, or a present, fixed right of future enjoyment.'" Id. at 514-15 (quoting Pearsall v. Great Northern Ry. Co., 161 U.S. 646, 673, 16 S.Ct. 705, 40 L.Ed. 838 (1896)).
We conclude that such a vested right was not created by the scope of the statutory guarantee of confidentiality previously afforded the reports of adverse medical incidents created by and for peer review committees at issue here. Instead, we agree with the First District that the principles set out in Clausell v. Hobart Corp., 515 So.2d 1275 (Fla.1987), provide the appropriate analysis. In Clausell, this Court concluded that a plaintiff did not have a vested right in his ability to bring a cause of action for products liability. Id. at 1276. In so holding, we relied upon Lamb v. Volkswagenwerk Aktiengesellschaft, 631 F.Supp. 1144 (S.D.Fla.1986), which in turn quoted the First District's decision in Division of Workers' Compensation v. Brevda, 420 So.2d 887 (Fla. 1st DCA 1982): "[T]o be vested, a right must be more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand. . . ." Brevda, 420 So.2d at 891 (quoting Aetna Ins. Co. v. Richardelle, 528 S.W.2d 280, 284 (Tex.Civ.App.1975)). We agree with the First District that the hospitals' claim rests on a mere expectation of the continuance of the legislative policy of limited access to the proceedings of peer review committees.
Importantly, the statutes in question do not actually create a statutory privilege. The statutes do not deem relevant materials to be either confidential or privileged. Rather, they provide that the investigations, proceedings, and records of the respective medical committees or organizations are not subject to discovery or introduction into evidence in any action against a health care provider arising out of the matters which are the subject of the committee or organization's inquiry. See §§ 395.0191(8), 395.0193(8), 766.101(5), Fla. Stat. (2005); cf. § 766.1016(2), Fla. Stat. (2005) ("Patient safety data shall not be subject to discovery or introduction into evidence in any civil or administrative action."). These statutes also provide that if information, documents, or records are otherwise available from the original sources, they are not shielded from discovery or use in any such civil or administrative action; and a witness who testifies before such committee or organization may not be prevented from testifying as to matters within his or her knowledge about the medical incident in question. See §§ 395.0191(8), 395.0193(8), 766.101(5), 766.1016(2), Fla. Stat. (2005). In reality, the restrictions are limited to the discovery or introduction of the proceedings into evidence in some but not all judicial *491 or administrative actions. They have no application to dissemination or use of the information within the medical institution involved or within the wider medical community.
Hence, medical providers have never been granted a substantive vested right in the secrecy of the information contained in the limited medical records in question. Rather, at most, medical providers received an expectancy that legislative policy favored only limited access and use of the records of certain investigations into reported instances of questionable medical conduct by peer review bodies. Indeed, the actual information regarding the adverse medical incident itself has never been cloaked in confidentiality; rather, it is the particular form in which the information was contained, such as a peer review report, that was given limited protection. However, the participants in a peer review proceeding have always been on notice that the information they possessed, as witnesses to an adverse medical incident for example, was never considered confidential and continued to be subject to disclosure, even in judicial and administrative proceedings. The nature of the expectancy of the continuation of this restrictive legislative policy, therefore, has never risen to the level of a settled, vested substantive right.
It is also a fact of legislative policy-making that the legislative scheme restricting access or use of these adverse incident records has remained fluid and subject to the discretion of the Legislature, which at any time could modify or repeal the governing statutes on access. Further, there have always been exceptions to the rule. For example, as we recently noted in Brandon Regional Hospital v. Murray, 957 So.2d 590 (Fla.2007), the state administrative agency charged with regulating health care in Florida has always had access to this information, meaning, of course, that it has never been wholly confidential. See id. at 594 ("Unlike the parties seeking access to documents submitted to, reviewed by, or created by the peer review committees in the other cases discussed, AHCA has been granted explicit statutory authority to inspect most records at licensed healthcare facilities."). In addition, any disciplinary action against a medical provider by a hospital must be reported to the State, and notice of any such action serious enough to constitute grounds for expulsion must be sent to every hospital and health maintenance organization in the state. § 458.337(1)(a)-(b), Fla. Stat. (2005). The medical provider, of course, cannot prevent that broad disclosure within the medical community. In addition, the federal courts have repeatedly held that even the limited statutory exemptions at issue may not be invoked to prevent disclosure or admission of the proceedings in federal cases. See Feminist Women's Health Ctr., Inc. v. Mohammad, 586 F.2d 530, 545 n. 9 (5th Cir.1978) (noting that the peer review privilege will not bar evidence in federal cause of action); see also Adkins v. Christie, 488 F.3d 1324, 1330 (11th Cir. 2007) (same), cert. denied, ___ U.S. ___, 128 S.Ct. 903, ___ L.Ed.2d ___ (2008). Hence, any expectations of continued limited access or use have been neither settled nor vested, but rest more upon "an anticipation of the continuance of an existing law" as explained in Brevda.
Where "rights" have been subject to modification or elimination at any time by the Legislature, courts have found them to be neither fixed nor vested. For example, in Earnhardt, the court upheld the retroactive application of a recently passed exemption to the Public Records Act. 821 So.2d at 396. Earnhardt held that the prior right to inspect autopsy photographs was not vested or fixed because it was "a *492 right subject to divestment by enactment of statutory exemptions by the Legislature." Id. at 398. Other Florida courts have reached the same conclusion regarding statutory exemptions to the Public Records Act. See Baker County Press, Inc. v. Baker County Med. Servs., Inc., 870 So.2d 189, 193 (Fla. 1st DCA 2004); News-Press Publ'g Co. v. Kaune, 511 So.2d 1023, 1026 (Fla. 2d DCA 1987). Other jurisdictions have reached similar conclusions. See, e.g., Evans v. Belth, 193 Ga.App. 757, 388 S.E.2d 914, 916 (1989) (explaining that there is no vested right in a statutory privilege that may be taken away by legislative amendment); Stott v. Stott Realty Co., 288 Mich. 35, 284 N.W. 635, 639 (1939) ("It is a general rule of constitutional law that a citizen has no vested right in statutory privileges and exemptions. . . ."); Doe v. Sundquist, 2 S.W.3d 919, 921 (Tenn. 1999) (holding that natural parents have no vested right in statutory privilege barring disclosure of their identities). Applying this principle, it is clear that the rights claimed here are also neither fixed nor vested because they were also subject to modification or elimination at any time by the Legislature. In fact, the patient parties point out that the statutes at issue have been subject to numerous legislative modifications through the years.
For all these reasons, we conclude these statutes do not create a vested right as contemplated by our case law and we concur with the First District in its conclusion that "the Hospital does not have a vested right in maintaining the confidentiality of adverse medical incidents. The Hospital's `right' is no more than an expectation that previously existing statutory law would not change." Notami Hosp., 927 So.2d at 143-44.
Because we find that the text of the amendment and the accompanying ballot summary clearly encompass access to existing adverse medical incident records, and furthermore that the medical providers' interest in the continuing confidentiality of these materials does not constitute a substantive right, we hold that amendment 7 provides access to existing histories of adverse medical incidents.

C. Section 381.028, Florida Statutes (2005)
Even though amendment 7 is self-executing and does not require legislative enactment, the Legislature is still free to give force and effect to its provisions so long as it does not run afoul of the rights granted in the constitution. See Gray, 125 So.2d at 851 (noting that rights granted by constitutional provisions may be "supplemented by legislation, further protecting the right or making it available"). However, as noted by the First District below, in its efforts to implement amendment 7, it appears the Legislature has substantially limited the right of access granted pursuant to the amendment.
The First District detailed four conflicts between amendment 7 and section 381.028, finding that the statute "drastically limits or eliminates discovery of records the amendment expressly states are discoverable, and limits the `patients' qualified to access those records." Notami Hosp., 927 So.2d at 143. Specifically, the court noted: (1) the statute only allows for final reports to be discoverable, while the amendment provides that "any records" relating to adverse medical incidents are subject to the amendment; (2) the statute only provides for disclosure of final reports relating to the same or a substantially similar condition, treatment, or diagnosis with that of the patient requesting access; (3) the statute limits production to only those records generated after November 2, 2004; and (4) the statute states that it will have no effect on existing privilege statutes. Id.; see also §§ 381.028(3)(j), (5)-(7)(a), *493 Fla. Stat. (2005). Accordingly, the First District concluded that in these respects, "the statute impermissibly restricts rights expressly granted under the Constitution." Notami Hosp., 927 So.2d at 143.
We agree that the four provisions cited by the Notami Hospital court contravene the broad rights of access to adverse medical incident records granted by amendment 7. In addition to those limitations noted by the First District, we also note that the statute provides that patients can only access the records of the facility or provider of which they themselves are a patient, a restriction not contained within the amendment. § 381.028(7)(a), Fla. Stat. (2005) ("[T]he adverse medical incident records to which a patient is granted access are those of the facility or provider of which he or she is a patient. . . ."). Furthermore, we observe that in addition to the limitation contained in subsection (6), the statute also provides that "all existing laws concerning the discoverability or admissibility into evidence of records of an adverse medical incident in any judicial or administrative proceeding remain in full force and effect." § 381.028(2), Fla. Stat. (2005). Because these restrictions and those identified by the district court conflict with the provisions of amendment 7, these statutory restrictions cannot stand.
However, while we concur with the First District in finding that section 381.028 contains provisions that curtail rights granted by amendment 7, we do not agree that this requires the invalidation of the entire statute. Although section 381.028 does not contain a severability clause, this does not affect our ability to sever the unconstitutional portions of the statute. See Ray v. Mortham, 742 So.2d 1276, 1280 (Fla.1999) ("Severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." (citing State v. Calhoun County, 126 Fla. 376, 170 So. 883, 886 (1936))).
The following questions guide this Court's severability analysis: (1) whether the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (2) if the good and bad features are not inseparable and if the Legislature would have passed one without the other; and (3) whether an act complete in itself remains after the invalid provisions are stricken. See Moreau v. Lewis, 648 So.2d 124, 128 (Fla. 1995) (quoting Presbyterian Homes v. Wood, 297 So.2d 556, 559 (Fla.1974)). We conclude that section 381.028 easily satisfies this analysis.
According to its "Purpose" section, the purpose of section 381.028 is "to implement s. 25, Art. X of the State Constitution." See § 381.028(2), Fla. Stat. (2005). We find that, minus any offending or conflicting provisions such as those outlined above, the statute appears to fulfill the purpose of implementing amendment 7. For example, the statute provides definitions of important terms, dictates that patient privacy restrictions be upheld, and identifies pursuant to other statutes the party responsible for identifying records of adverse medical incidents. § 381.028(3)(4), 7(b), Fla. Stat. (2005). Section 381.028 also provides that fees for the production of records cannot exceed the reasonable cost of complying with the request and that requests for production must be processed in a timely manner. § 381.028(7)(c), Fla. Stat. (2005). Clearly the unconstitutional provisions are separable from the remainder of the statute and it remains complete in itself without the unconstitutional sections. We conclude that these unconstitutional subsections may be eliminated without the need to strike down section 381.028, Florida Statutes *494 (2005), in its entirety. The offending subsections can be separated without any adverse effect on its remaining portions, leaving intact a workable and helpful statute. Accordingly, we find that the legislative purpose of section 381.028 can be accomplished if the unconstitutional sections discussed above are severed.

IV. CONCLUSION
Based upon the circumstances presented by the two decisions below regarding the scope of amendment 7, we find that the amendment is self-executing. We also hold that the right of access granted pursuant to the amendment is retroactive and therefore applies to adverse medical incident records existing prior to its effective date of November 2, 2004. Finally, although we find several subsections of 381.028 to unconstitutionally impinge upon the rights granted pursuant to amendment 7, we sever those unconstitutional sections from the statute and allow the remainder to stand.
While we have differed in some respects with the opinion of the Fifth District in Buster, we cannot improve upon Judge Sawaya's concluding comments:
We believe that Amendment 7 heralds a change in the public policy of this state to lift the shroud of privilege and confidentiality in order to foster disclosure of information that will allow patients to better determine from whom they should seek health care, evaluate the quality and fitness of health care providers currently rendering service to them, and allow them access to information gathered through the self-policing processes during the discovery period of litigation filed by injured patients or the estates of deceased patients against their health care providers. We have come to this conclusion because we are obliged to interpret and apply Amendment 7 in accord with the intention of the people of this state who enacted it, and we have done so. It is not for us to judge the wisdom of the constitutional amendments enacted or the change in public policy pronounced through those amendments, even in instances where the change involves abrogation of long-standing legislation that establishes and promotes an equally or arguably more compelling public policy. See Sebring Airport Auth. v. McIntyre, 783 So.2d 238, 244 (Fla.2001).
Hence, what the Legislature has given through its enactments and the courts have enforced through their decisions, the people can take away through the amendment process to our state constitution. Moreover, what the people provide in their constitution, the Legislature and the courts may not take away through subsequent legislation or decision.
Buster, 932 So.2d at 355-56. We affirm the First District's decision in Notami Hospital; we approve in part and quash in part the decision of the Fifth District in Buster and remand for further proceedings in accord herewith.
It is so ordered.
LEWIS, C.J., and ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion, in which CANTERO and BELL, JJ., concur.
WELLS, J., concurring in part and dissenting in part.
I concur that the amendment is self-executing. I dissent from the majority's decision that the amendment is to be applied retroactively. I join Judge Ervin's dissent in the First District Court of Appeal's case of Notami Hospital of Florida, Inc. v. Bowen, 927 So.2d 139 (Fla. 1st DCA *495 2006), and in the unanimous opinion of the Fifth District Court of Appeal in Florida Hospital Waterman, Inc. v. Buster, 932 So.2d 344 (Fla. 5th DCA 2006). I conclude that the majority's decision is contrary to the law and fundamental fairness. I specifically reject the majority's and the First District's conclusion that the statute, which for over twenty years has protected hospitals' statutorily mandated peer review as part of medical quality assurance, did not establish vested rights that the investigations, proceedings, and records of peer review panels were "not subject to discovery" and could not be introduced into evidence in civil actions. § 395.0193(8), Fla. Stat. (2002).[7] Furthermore, to allow discovery of peer review records containing statements by those who had a right to rely upon the statute's promise that the records would not be discovered or introduced in a civil action is not only legally unsupportable but is fundamentally unfair and puts into jeopardy all statements made based upon the promise of any statutory privilege.

A. Rule of Law in Determining Retroactivity
The majority states that the use of the word "`retroactive' may be somewhat confusing in the context herein." Majority op. at 486. I do not agree. The taking away of a right to not have information and records which were developed when a statute guaranteed that the information and records could not be discovered or introduced in a civil action by eliminating the guarantee after the information and records have been developed is quintessential retroactivity. As set out in footnote 7, the history of the statutory right was that it was a substantive part of the legislative scheme to reform health care. In Cruger v. Love, 599 So.2d 111, 113 (Fla.1992), this Court made clear that the guarantee of confidentiality of peer review was an integral part of the Legislature's plan to control the escalating cost of health care:

*496 The Florida Legislature enacted these peer review statutes in an effort to control the escalating cost of health care by encouraging self-regulation by the medical profession through peer review and evaluation. Holly v. Auld, 450 So.2d 217, 219-20 (Fla.1984) (interpreting former section 768.40(4), Florida Statutes, the predecessor to section 766.101). In order to make meaningful peer review possible, the legislature provided a guarantee of confidentiality for the peer review process. Holly, 450 So.2d at 220.
In fact, this Court plainly stated that the right to keep the statements and information confidential was a substantive part of the legislative mandate:
The privilege afforded to peer review committees is intended to prohibit the chilling effect of the potential public disclosure of statements made to or information prepared for and used by the committee in carrying out its peer review function.
Id. at 114-15. We expressly acknowledged the precedent of Cruger on this issue as recently as May 2007 in Brandon Regional Hospital v. Murray, 957 So.2d 590 (Fla.2007). Thus, there can actually be no serious question that the rules of retroactivity apply.
In Smiley v. State, 966 So.2d 330 (Fla. 2007), this Court recently set forth the appropriate analysis to undertake when determining the retroactive application of a change in law. One of the first "key considerations" is to determine whether the change constitutes a procedural/remedial change or is a substantive change in the law. Smiley, 966 So.2d at 334. Generally, courts retroactively apply only remedial statutes, which do not create new rights or take away vested rights but operate only in furtherance of the remedy already existing. See id. If the law constitutes a substantive change, either by creating new rights or taking away vested rights, there is a presumption against the retroactive application of the change in law unless the Legislature has expressly stated to the contrary. Id.; see also Arrow Air, Inc. v. Walsh, 645 So.2d 422, 424 (Fla.1994). Even if there is a clear legislative intent for retroactive application, however, courts must determine whether this is constitutionally permissible. Although this case involves a change which was adopted by constitutional amendment, as opposed to a statutory amendment, the principles governing a change in statutory law apply equally to the current scenario. See State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983) (applying the same test to determine whether a constitutional amendment can be applied retroactively).
As addressed above, the first consideration is to determine whether the provision is remedial or substantive. Despite the recent holding in Smiley, the majority fails to discuss the remedial/substantive distinction and the prior case law which recognizes this as a key consideration. A review of prior cases explains the underlying purpose as to why "[t]he presumption against retroactive application of a law that affects substantive rights, liabilities, or duties is a well established rule of statutory construction." Arrow Air, 645 So.2d at 425. As this Court has explained:
Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that [the legislature] itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to [the legislature] responsibility for fundamental policy judgments concerning *497 the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.
Id. (quoting Landgraf v. USI Film Products, 511 U.S. 244, 272-73, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). In Bates v. State, 750 So.2d 6, 10 (Fla.1999), this Court noted that one of the reasons retroactive application of laws is disfavored is because it is "contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law." Id. (quoting Herbert Broom, Legal Maxims 24 (8th ed.1911)). This Court reaffirmed these principles in In re Advisory Opinion to the GovernorTerms of County Court Judges, 750 So.2d 610 (Fla.1999):
Unless specifically stated in the text or in the statement placed on the ballot, constitutional amendments are generally given prospective effect only. See State v. Lavazzoli, 434 So.2d 321, 323 (Fla.1983) ("Nowhere in either article I, section 12 as amended or in the statement placed on the November ballot is there manifested any intent that the amendment be applied retroactively. Therefore, the amendment must be given prospective effect only."). We find no reason to deviate from this general rule in the present case. In fact, while the voters were put on notice of the possibility that Amendment 7 might apply to judges appearing on the November 1998 ballot, there was no indication that Amendment 7 would apply to judges already in office. Applying Amendment 7 to those judges who began their terms on January 7, 1997, would undermine the settled expectations of both the officeholders and the people of this State, who believed that the term of office was four years. Therefore, because Amendment 7 should not be applied retroactively, the answer to your second question is that those county court judges whose terms began on January 7, 1997, should not be recommissioned for terms of office to expire on January 6, 2003.
Id. at 614-15. Accordingly, if a constitutional amendment does not clearly express an intent for retroactive application, this Court has "repeatedly refused to construe the amendment to affect detrimentally the substantive rights of persons arising under the prior law." Lavazzoli, 434 So.2d at 324 (relying upon its decisions in Myers v. Hawkins, 362 So.2d 926 (Fla.1978); State ex rel. Judicial Qualifications Comm'n v. Rose, 286 So.2d 562 (Fla.1973); and State ex rel. Reynolds v. Roan, 213 So.2d 425 (Fla.1968)). This Court emphasized that this well-established rule of construction "applies with particular force to those instances where retrospective operation of the law would impair or destroy existing rights." Lavazzoli, 434 So.2d at 323 (emphasis added); see also Alamo Rent-A-Car, Inc. v. Mancusi, 632 So.2d 1352, 1358 (Fla.1994) ("A substantive statute is presumed to operate prospectively rather than retrospectively unless the Legislature clearly expresses its intent that the statute is to operate retrospectively. This is especially true when retrospective operation of a law would impair or destroy existing rights." (citations omitted)).
This Court will generally not "apply a statute retroactively if the statute impairs vested rights, creates new obligations, or imposes new penalties." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 61 (Fla.1995) (finding that even though the Legislature expressly stated that section 627.727(10), Fla. Stat., was remedial and was to be applied retroactively, it was substantive and could not be applied retroactively because it significantly altered the *498 language used to determine fines imposed on a violator); see also McCord v. Smith, 43 So.2d 704, 708-09 (Fla.1949) (holding that a retrospective provision of a legislative act is invalid "only in those cases wherein vested rights are adversely affected or destroyed or when a new obligation or duty is created or imposed, or an additional disability is established, on connection with transactions or considerations previously had or expiated"); DaimlerChrysler Corp. v. Hurst, 949 So.2d 279, 285 (Fla. 3d DCA 2007) ("Generally, due process considerations prevent the State from retroactively abolishing vested rights. Thus, retroactive abolition of substantive vested rights is prohibited by constitutional due process considerations."), review denied, 962 So.2d 337 (Fla.2007); Basel v. McFarland & Sons, Inc., 815 So.2d 687, 692 (Fla. 5th DCA 2002) ("Even when the legislature expressly states that a statute is to have retroactive application, courts will refuse to apply the statute retroactively if the statute impairs vested rights, creates new obligations, or imposes new penalties."). The majority simply casts aside all of this precedent to reach its result.

B. Whether There is Clear Intent for Retroactive Application
In respect to Amendment 7, while the statements of purpose and the amendment stated that, if enacted, it would change the current law that protected these statements and reports, neither the amendment, its declared purpose, nor the summary explicitly addressed retroactivity. The Legislature reviewed the constitutional provision, including the lack of any specific provisions or words addressing retroactivity, and determined that the revision was not retroactive. See § 381.028(2), Fla. Stat. (2005). Since there is no contrary intent set forth in the amendment, in accord with abundant precedent, this Court should presume that the Legislature acted constitutionally in adopting this statute. See, e.g., State v. Giorgetti, 868 So.2d 512, 518 (Fla.2004) (quoting this Court's prior case of Gray v. Central Fla. Lumber Co., 104 Fla. 446, 140 So. 320, 323 (1932), for its holding that "[o]n its face every act of the Legislature is presumed to be constitutional [and] every doubt as to its constitutionality must be resolved in its favor"); N. Fla. Women's Health & Counseling Servs., Inc. v. State, 866 So.2d 612, 625-26 (Fla. 2003) ("[I]n the absence of an impingement upon constitutional rights . . . an act of the legislature is presumed to be constitutional.") (quoting State v. Bussey, 463 So.2d 1141, 1144 (Fla.1985)); Bunnell v. State, 453 So.2d 808, 809 (Fla.1984) (stating in review of single subject challenge that "legislative acts are presumed to be constitutional and that courts should resolve every reasonable doubt in favor of constitutionality"). This presumption affords proper deference to the legislative branch of our government.
As the Fifth District points out, the amendment stated that it was to become effective on the date it was approved, which clearly states a present effectiveness, not a retroactive effectiveness. See Fla. Hosp. Waterman, 932 So.2d at 354. The majority reaches the contrary conclusion that the constitutional amendment was intended to apply retroactively, asserting that "the purpose of amendment 7 plainly contemplates that its application would provide access to existing records by overriding and supplanting existing statutory provisions." However, this Court has explicitly rejected the theory that simply because applying a statute retroactively would vindicate its purpose more fully is a sufficient reason to rebut the presumption against retroactivity. See Arrow Air, 645 So.2d at 425; Metropolitan Dade County v. Chase Fed. Housing Corp., 737 So.2d 494 (Fla.1999); see also Landgraf, 511 U.S. at 285-86, 114 S.Ct. *499 1483 (holding that the rationale that "retroactive application of a new statute would vindicate its purpose more fully . . . is not [a] sufficient [justification] to rebut the presumption against retroactivity").
The First District and the majority define the word "patient" as one who "had previously undergone treatment" and then treat this phrase as an expression of a "clear intent that the records subject to disclosure include those created prior to the effective date of the amendment." Notami Hospital, 927 So.2d at 145; majority op. at 487. I do not agree. It is important to point out that the word "previously" is not found anywhere in the text of the amendment or the ballot summary. This language comes from the First District's opinion in Notami, which the majority then adopted. Likewise, the majority relies on the term "any," but this term is also not in the ballot summary that was before the voters. The ballot summary and ballot title use only the present tense or future tense in describing the impact of the initiative.[8]
Because this constitutional amendment was passed by initiative, in determining the intent behind the constitutional amendment, this Court must look to the information before the voters and whether the voters of the constitutional amendment meant for this amendment to apply retroactively. However, the only information immediately available to the voters when casting their ballots is the ballot title or summary. Cf. Advisory Op. to the Att'y Gen. re Additional Homestead Tax Exemption, 880 So.2d 646, 653-54 (Fla.2004) ("Voters deciding whether to approve a proposed amendment to our constitution never see the actual text of the proposed amendment. They vote based only on the ballot title and the summary."). This becomes very important when viewed in light of this Court's precedent, which emphasizes that whether a drafter intended a certain effect does not matter nearly as much as the probable intent of the voters as evidenced by the materials they had available. See Myers v. Hawkins, 362 So.2d 926, 930 (Fla.1978) ("We have already held that the intent of the framer of a constitutional provision adopted by initiative petition will be given less weight in discerning the meaning of an ambiguous constitutional term that [sic] the probable intent of the people who reviewed the literature and the proposal submitted for their consideration."); Williams v. Smith, 360 So.2d 417, 420 n. 5 (Fla.1978) ("In analyzing a constitutional amendment adopted by initiative rather than by legislative or constitution revision commission vote, the intent of the framers should be accorded less significance than the intent of the voters as evidenced by materials they had available as predicate for their collective decision."). In applying those principles to this case, this Court must recognize that the ballot summary and ballot title have none of the ambiguous terms which allegedly show an intent for retroactive applicationinstead, these materials show a clear intent that the constitutional provision will only apply prospectively.
In looking to the amendment itself, the amendment provides that a patient is an individual who, in the present or in the past, has sought or undergone treatment and by this amendment the patient is provided a right to records made by a health care facility or provider relating to any adverse medical incident. As this Court held in Advisory Opinion to Attorney General re Patients' Right to Know, 880 *500 So.2d 617, 618 (Fla.2004), and as set forth in the majority opinion at page 488, the purpose of the amendment was "to create a constitutional right" to access the records. It logically follows that the past treatment to which the amendment extends is to the date of the creation of the right, which is the effective date of the amendment.
The majority in its footnote 4 cites to State ex rel. Beacon Journal Publishing Co. v. University of Akron, 64 Ohio St.2d 392, 415 N.E.2d 310 (1980). The majority, however, omits the part of the Ohio decision that is essential in analyzing the question of retroactivity here. That part states:
Any interests in confidentiality that may have been affected by reliance upon prior law in compiling these reports by the university are adequately safeguarded by R.C. 149.43 itself. These interests are dealt with extensively in R.C. 149.43(A)(2) and (4) which define "confidential law enforcement investigatory records" and "trial preparation records" which are exempted from public availability.

Id. at 314 (emphasis added). This part of the decision from the Ohio Supreme Court demonstrates another reason why the present amendment cannot be properly applied retroactively because the amendment, unlike the Ohio provision, does not have a provision that the records made upon the reliance of the existing statutory privilege are safeguarded so that the State's promise of nonavailability is kept. Similarly, State of Hawai'i Organization of Police Officers v. Society of Professional Journalists, 83 Hawai'i 378, 927 P.2d 386, 397 (1996), affects only an agency's prospective duty of disclosure and impairs no existing rights.

C. Vested Substantive Right
The majority states at page 490: "Importantly, the statutes in question do not actually create a statutory privilege. The statutes do not deem relevant materials confidential or privileged." This statement is in direct conflict with what this Court held in Cruger in dealing with these precise statutory sections where the Court said:
We have previously held that "[t]he discovery privilege . . . was clearly designed to provide that degree of confidentiality necessary for the full, frank medical peer evaluation which the legislature sought to encourage." Holly v. Auld, 450 So.2d at 220. Without the privilege, information necessary to the peer review process could not be obtained. Feldman v. Glucroft, 522 So.2d 798, 801 (Fla.1988). While we recognized in Holly that the discovery privilege would impinge upon the rights of litigants to obtain information helpful or even essential to their cases, we assumed that the legislature balanced that against the benefits offered by effective self-policing by the medical community. Holly, 450 So.2d at 220.
We hold that the privilege provided by sections 766.101(5) and 395.011(9), Florida Statutes, protects any document considered by the committee or board as part of its decision-making process. The policy of encouraging full candor in peer review proceedings is advanced only if all documents considered by the committee or board during the peer review or credentialing process are protected. Committee members and those providing information to the committee must be able to operate without fear of reprisal. Similarly, it is essential that doctors seeking hospital privileges disclose all pertinent information to the committee. Physicians who fear that *501 information provided in an application might someday be used against them by a third party will be reluctant to fully detail matters that the committee should consider. Accordingly, we find that a physician's application for staff privileges is a record of the committee or board for purposes of the statutory privilege.
. . . .
The policy behind the confidentiality privilege mandates this interpretation. See Byrd v. Richardson-Greenshields Sec., Inc., 552 So.2d 1099, 1102 (Fla. 1989) (a court's obligation is to honor the obvious legislative intent and policy behind an enactment, even where that intent requires an interpretation that exceeds the literal language of the statute). The privilege afforded to peer review committees is intended to prohibit the chilling effect of the potential public disclosure of statements made to or information prepared for and used by the committee in carrying out its peer review function. See Dworkin v. St. Francis Hosp., Inc., 517 A.2d 302, 307 (Del.Super.Ct.1986). This chilling effect is attributable to several factors. As one commentator has noted:
[D]octors seem to be reluctant to engage in strict peer review due to a number of apprehensions: loss of referrals, respect, and friends, possible retaliations, vulnerability to torts, and fear of malpractice actions in which the records of the peer review proceedings might be used. It is this ambivalence that lawmakers seek to avert and eliminate by shielding peer review deliberations from legal attacks.
Gregory G. Gosfield, Medical Peer Review Protection in the Health Care Industry, 52 Temp. L.Q. 552, 558 (1979) (footnote omitted). These fears are alleviated only by interpreting the statute as we do today.
A different interpretation of this provision would completely eviscerate the protection the legislature sought to provide. Ultimately, all peer review committee records would be discoverable. What would not be discoverable in one action because of the nature of the lawsuit would be discoverable in another action. The confidential nature of the peer review proceedings would be obliterated. See Sanderson v. Frank S. Bryan, M.D., Ltd., 361 Pa.Super. 491, 522 A.2d 1138, 1141 (1987) (interpreting the confidentiality provision of Pennsylvania's Peer Review Protection Act), appeal denied, 517 Pa. 624, 538 A.2d 877 (1988).
Cruger, 599 So.2d at 113-15. Thus, pursuant to this Court's express opinion in Cruger and as acknowledged in Brandon Regional Hospital, 957 So.2d at 594, the statutes in question do actually create a statutory privilege.[9] The majority here is plainly in error.
Furthermore, it is not germane to what this Court held was the intent of this privilege that these statutes do not protect the information in federal court cases involving the application of federal causes of actions as in Feminist Women's Health Center, Inc. v. Mohammad, 586 F.2d 530, 545 n. 9 (5th Cir.1978), or Adkins v. Christie, 488 F.3d 1324, 1330 (11th Cir. 2007), or in disciplinary actions pursuant to section 458.337(1)(a)-(b), Florida Statutes.[10] *502 Again, in Cruger, this Court specifically recognized that the purpose of the privilege was to protect against vulnerability to tort claims and fear of malpractice actions, which are civil actions expressly referred to in the statutes. We reiterated and enforced this holding in Brandon Regional Hospital, 957 So.2d at 594.
As noted earlier, the majority and the First District concluded the hospitals had no vested right in the statutory privilege upon which they relied and that in order to be vested, "a right must be more than a mere expectation based on an anticipation of the continuance of an existing law." Majority op. at 490 (quoting Div. of Workers' Comp. v. Brevda, 420 So.2d 887, 891 (Fla. 1st DCA 1982)). According to the majority, when a statutory privilege is repealed, then all communication made during the period when the privilege did exist are unclothed of their privilege. However, the majority provides no authority from Florida courts for this extraordinary and troubling holding. The cases to which the majority cites, Campus Communications, Inc. v. Earnhardt, 821 So.2d 388, 395 (Fla. 5th DCA 2002); Baker County Press, Inc. v. Baker County Medical Services, Inc., 870 So.2d 189, 193 (Fla. 1st DCA 2004); News-Press Publishing Co. v. Kaune, 511 So.2d 1023, 1026 (Fla. 2d DCA 1987), are inapposite. These cases involve situations in which the exemption from disclosure of records was enacted after the creation of the record. The records were not required to be disclosed. The legislative enactments were expressly remedial. There was no reliance upon the record not being disclosed as there is when records are created and information conveyed in reliance upon a privilege against their use. See, e.g., Salt Lake Child & Family Therapy Clinic, Inc. v. Frederick, 890 P.2d 1017 (Utah 1995) (holding that a new statute which modified a mental health therapist privilege could not be applied retroactively and that the relevant time period was when the privileged communications took place, not the time period when the interested person is seeking to gain access to the privileged information).[11] It is particularly troubling because the majority's decision in respect to this statutory privilege puts all communications made in reliance upon other privileges at risk,[12] making the *503 privilege guarding the conversations contingent upon the continuing existence of the statutory privilege. Numerous privileges are creatures of statute.[13] These privileges have historically been honored because the privileges promote candor necessary and beneficial to the relationships which gave rise to the communication. Privileged communications will have a whole new character now that the communications are exposed to future disclosure.
The straightforward fact is that the State made a promise by statute that if health care providers were open and frank about problems in care and treatment, their openness and frankness would be protected from disclosure. Clearly, since this was a statutory right to confidentiality, it was subject to being changed prospectively. But those who complied with this statutory right clearly had an equal right to rely on the State's promise that records made while the confidentiality applied would remain confidential. Now, by this decision, the State's promise is broken. For the above reasons, I dissent from the majority's holding that the law should be applied retroactively.
CANTERO and BELL, JJ., concur.
NOTES
[1] The amendment was passed by a vote of 81.2 percent in favor and 18.8 percent against. Fla. Dep't of State, Div. of Elections, Nov. 2, 2004 General Election, Official Results, http://election.dos.state.fl.us/elections/ resultsarchive/ (select "2004 General" election from dropdown menu; then select "Const. Amendments" from dropdown menu).
[2] Amendment 7, as proposed to the Secretary of State and to this Court, included an "Effective Date and Severability" section. That section was not officially added to the Florida Constitution. See art. X, § 25, Fla. Const.; Patients' Right to Know, 880 So.2d at 619.
[3] This stated purpose of this statute is to implement amendment 7. The statute provides:

381.028. Adverse medical incidents. 
(1) SHORT TITLE.  This section may be cited as the "Patients' Right-to-Know About Adverse Medical Incidents Act."
(2) PURPOSE.  It is the purpose of this act to implement s. 25, Art. X of the State Constitution. The Legislature finds that this section of the State Constitution is intended to grant patient access to records of adverse medical incidents, which records were made or received in the course of business by a health care facility or provider, and not to repeal or otherwise modify existing laws governing the use of these records and the information contained therein. The Legislature further finds that all existing laws extending criminal and civil immunity to persons providing information to quality-of-care committees or organizations and all existing laws concerning the discoverability or admissibility into evidence of records of an adverse medical incident in any judicial or administrative proceeding remain in full force and effect.
(3) DEFINITIONS.  As used in s. 25, Art. X of the State Constitution, and this act, the term:
(a) "Agency" means the Agency for Health Care Administration.
(b) "Adverse medical incident" means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider which caused or could have caused injury to or the death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, incidents that are reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee or any representative of any such committee.
(c) "Department" means the Department of Health.
(d) "Have access to any records" means, in addition to any other procedure for producing the records provided by general law, making the records available for inspection and copying upon formal or informal request by the patient or a representative of the patient, provided that current records that have been made publicly available by publication or on the Internet may be provided by reference to the location at which the records are publicly available.
(e) "Health care provider" means a physician licensed under chapter 458, chapter 459, or chapter 461.
(f) "Health care facility" means a facility licensed under chapter 395.
(g) "Identity" means any "individually identifiable health information" as defined by the Health Insurance Portability and Accountability Act of 1996 or its implementing regulations.
(h) "Patient" means an individual who has sought, is seeking, is undergoing, or has undergone care or treatment in a health care facility or by a health care provider.
(i) "Privacy restrictions imposed by federal law" means the provisions relating to the disclosure of patient privacy information under federal law, including, but not limited to, the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub.L. No. 104-91, and its implementing regulations, the Federal Privacy Act, 5 U.S.C. s. 552(a), and its implementing regulations, and any other federal law, including, but not limited to, federal common law and decisional law, that would prohibit the disclosure of patient privacy information.
(j) "Records" means the final report of any adverse medical incident. Medical records that are not the final report of any adverse medical incident, including drafts or other nonfinal versions; notes; and any documents or portions thereof which constitute, contain, or reflect any attorney-client communications or any attorney-client work product may not be considered "records" for purposes of s. 25, Art. X of the State Constitution and this act.
(k) "Representative of the patient" means a parent of a minor patient, a court-appointed guardian for the patient, a health care surrogate, or a person holding a power of attorney or notarized consent appropriately executed by the patient granting permission to a health care facility or health care provider to disclose the patient's health care information to that person. In the case of a deceased patient, the term also means the personal representative of the estate of the deceased patient; the deceased patient's surviving spouse, surviving parent, or surviving adult child; the parent or guardian of a surviving minor child of the deceased patient; or the attorney for any such person.
(4) PATIENTS' RIGHT OF ACCESS.  Patients have a right to have access to any records made or received in the course of business by a health care facility or health care provider relating to any adverse medical incident. In providing access to these records, the health care facility or health care provider may not disclose the identity of patients involved in the incidents and shall maintain any privacy restrictions imposed by federal law.
(5) APPLICABILITY.  Section 25, Art. X of the State Constitution applies to records created, incidents occurring, and actions pending on or after November 2, 2004. Section 25, Art. X of the State Constitution does not apply to records created, incidents occurring, or actions pending before November 2, 2004. A patient requesting records on or after November 2, 2008, shall be eligible to receive records created within 4 years before the date of the request.
(6) USE OF RECORDS. 
(a) This section does not repeal or otherwise alter any existing restrictions on the discoverability or admissibility of records relating to adverse medical incidents otherwise provided by law, including, but not limited to, those contained in ss. 395.0191, 395.0193, 395.0197, 766.101, and 766.1016, or repeal or otherwise alter any immunity provided to, or prohibition against compelling testimony by, persons providing information or participating in any peer review panel, medical review committee, hospital committee, or other hospital board otherwise provided by law, including, but not limited to, ss. 395.0191, 395.0193, 766.101, and 766.1016.
(b) Except as otherwise provided by act of the Legislature, records of adverse medical incidents, including any information contained therein, obtained under s. 25, Art. X of the State Constitution, are not discoverable or admissible into evidence and may not be used for any purpose, including impeachment, in any civil or administrative action against a health care facility or health care provider. This includes information relating to performance or quality improvement initiatives and information relating to the identity of reviewers, complainants, or any person providing information contained in or used in, or any person participating in the creation of the records of adverse medical incidents.
(7) PRODUCTION OF RECORDS. 
(a) Pursuant to s. 25, Art. X of the State Constitution, the adverse medical incident records to which a patient is granted access are those of the facility or provider of which he or she is a patient and which pertain to any adverse medical incident affecting the patient or any other patient which involves the same or substantially similar condition, treatment, or diagnosis as that of the patient requesting access.
(b)1. Using the process provided in s. 395.0197, the health care facility shall be responsible for identifying records as records of an adverse medical incident, as defined in s. 25, Art. X of the State Constitution.
2. Using the process provided in s. 458.351, the health care provider shall be responsible for identifying records as records of an adverse medical incident, as defined in s. 25, Art. X of the State Constitution, occurring in an office setting.
(c)1. Fees charged by a health care facility for copies of records requested by a patient under s. 25, Art. X of the State Constitution may not exceed the reasonable and actual cost of complying with the request, including a reasonable charge for the staff time necessary to search for records and prevent the disclosure of the identity of any patient involved in the adverse medical incident through redaction or other means as required by the Health Insurance Portability and Accountability Act of 1996 or its implementing regulations. The health care facility may require payment, in full or in part, before acting on the records request.
2. Fees charged by a health care provider for copies of records requested by a patient under s. 25, Art. X of the State Constitution may not exceed the amount established under s. 456.057(16), which may include a reasonable charge for the staff time necessary to prevent the disclosure of the identity of any patient involved in the adverse medical incident through redaction or other means as required by the Health Insurance Portability and Accountability Act of 1996 or its implementing regulations. The health care provider may require payment, in full or in part, before acting on the records request.
(d)1. Requests for production of adverse medical incident records shall be processed by the health care facility or health care provider in a timely manner, after having a reasonable opportunity to determine whether or not the requested record is a record subject to disclosure and to prevent the disclosure of the identity of any patient involved in the adverse medical incident through redaction or other means.
2. A request for production of records must be submitted in writing and must identify the patient requesting access to the records by name, address, and the last four digits of the patient's social security number; describe the patient's condition, treatment, or diagnosis; and provide the name of the health care providers whose records are being sought.
§ 381.028, Fla. Stat. (2005).
[4] In State ex rel. Beacon Journal Publishing Co. v. University of Akron, 64 Ohio St.2d 392, 415 N.E.2d 310 (1980), the Ohio Supreme Court rejected a contention similar to that now advanced by the hospitals that records generated prior to the effective date of an amendment to the public records disclosure statute were immune from disclosure:

[W]e initially note that [the statute] speaks in terms of "all public records" and makes no distinction for those records compiled prior to its effective date. More importantly [sic], however, is the simple fact that Beacon Journal is not seeking to apply the statute in a retrospective manner, but is instead seeking present access to the records. Concededly, the creation of the records took place prior to the legislative amendment at issue, but this is not the conduct regulated by the statute. [The statute] deals with the availability of public records, not with the recordation function of governmental units. The date the records were made is not relevant under the statute. Since the statute merely deals with record disclosure, not record keeping, only a prospective duty is imposed upon those maintaining public records.
Id. at 313 (emphasis supplied); see also State of Haw. Org. of Police Officers v. Soc'y of Prof'l Journalists, 83 Hawai'i 378, 927 P.2d 386, 397 (1996) (rejecting a municipality's argument that application of a disclosure statute enacted in 1993 to records generated in 1988 constituted an improper retroactive application).
[5] Amendment 7, as proposed to the Secretary of State and to this Court, included a "Statement and Purpose" section. Section 1 of the proposed amendment was entitled "Statement and Purpose" and contained a paragraph explaining the purpose of the amendment. Section 2 was then entitled "Amendment to the Florida Constitution," and read: "Art. X, Fla. Const., is amended by inserting the following new section at the end thereof, to read: Section 22. Patients' Right to Know About Adverse Medical Incidents." Accordingly, only section 2 was actually added to Florida's Constitution; the language included in the proposed amendment's "Statement and Purpose" section was not added. See art. X, § 25, Fla. Const.; Patients' Right to Know, 880 So.2d at 618.
[6] Clearly, one of the primary purposes of the amendment is to provide a patient contemplating treatment by a medical provider access to that provider's past history of adverse medical incidents. The hospitals' strained reading of the amendment would deny the patient access to this information, hence defeating a major purpose of the amendment. In fact, under this interpretation a patient would never gain access to the medical provider's actual "history of acts, neglects or defaults" since any such history that took place prior to the passage of the amendment would remain immune from disclosure.
[7] In order to fully appreciate the effect of this decision as to retroactivity, it is important to first review the law which made these records confidential until the constitutional revision. Prior to Amendment 7, in order to secure quality medical services to the public, the Florida Legislature enacted an in-depth system with a state-mandated peer review process. In 1973, the Legislature first created the peer review evidentiary privilege in an effort to encourage hospitals to use and promulgate programs establishing committees for the purpose of reviewing standards of care, utilization, and expense in the rendering of health services in an effort to deter the rising costs of health care. See ch. 73-50, § 1, Laws of Fla. In 1982, the Legislature passed a comprehensive act regulating the licensure of hospitals with a state-mandated peer review process in order to improve medical care for the public by fostering and enhancing peer review. The act, which among numerous other provisions, provided that the proceedings and records of committees and governing bodies of any licensed facility relating to disciplinary actions against persons with staff privileges were not subject to inspection under chapter 119, and any meetings were not required to be open to the public. See ch. 82-182, § 26, at 655, Laws of Fla. These provisions were amended over the years and included an explicit requirement for licensed facilities to provide for peer review of the physicians who deliver health care services at the facility and guaranteeing that the proceedings or records of such proceedings would not be subject to discovery or introduction into evidence in any civil or administrative action against a provider of professional health care services arising out of matters which were the subject of evaluation and review. The fundamental premise of the act was the peer review process would be enhanced if health care providers knew that the records of the review would not be used against them in medical malpractice or libel civil actions. Holly v. Auld, 450 So.2d 217 (Fla. 1984). The sections protecting records and statements in peer review are sections 395.0191(8), 395.0193(8), 766.101(5), 766.1016(2), and 395.0197(6)(c), (7), (8), (13) of the Florida Statutes (2002).
[8] For example, the ballot summary includes the phrase "could cause" instead of "caused or could have caused" used in the text of the amendment-another signal that the voters considered this amendment as applying only prospectively, not retroactively.
[9] In fact, the majority in Cruger was joined by all members of the Court in agreeing that these provisions do create a statutory discovery privilege, with Justices Kogan and Shaw concurring specially.
[10] States have never had the power to dictate what evidentiary privileges federal courts should recognize when applying a federal cause of action.
[11] The cases from other jurisdictions cited by the majority do not support the majority's argument. The majority relies on Evans v. Belth, 193 Ga.App. 757, 388 S.E.2d 914, 916 (1989). In that case, the appellee sought access to information in the Insurance Regulatory Information System. Subsequently, while the case was on appeal, the Georgia Legislature amended the law to exempt these records from the open records act. The court addressed the question in the opposite fashion, i.e., whether a law granting public access to records was a grant of a statutory privilege to the public. While the court used the term "privilege," the court was addressing the first definition of privilege which broadly applies to all rights, exemptions, and immunities; it did not involve the same type of privilege which is at issue here: an evidentiary privilege. The other cases relied upon by the majority also all involve the broader term of privilege. See, e.g., Stott v. Stott Realty Co., 288 Mich. 35, 284 N.W. 635 (1939) (addressing a case where a corporation failed to pay its "privilege fees" for two consecutive years which, by statute, rendered its charter void); Doe v. Sundquist, 2 S.W.3d 919, 924 (Tenn. 1999) (addressing an amendment to adoption laws which never provided "even a reasonable expectation by the birth parent or any other party that adoption records were permanently sealed"; the court held that procedural changes to the law permitting adoption records to be disclosed to the adopted person over age twenty-one would be applied retroactively).
[12] In fact, when the Florida Legislature first created the Florida Evidence Code, which statutorily recognized numerous privileges, the Legislature carefully provided that "Nothing in this act shall abrogate a privilege for any communication which was made prior to the effective date of this act, if such communication was privileged at the time it was made." See ch. 76-237, § 1, at 566, Laws of Fla. (creating section 90.509).
[13] See, e.g., § 44.405, Fla. Stat. (2006) (providing a privilege for all mediation parties regarding mediation communication); § 90.5015, Fla. Stat. (2006) (providing for journalist's privilege); § 90.502, Fla. Stat. (2006) (providing for lawyer-client privilege); § 90.503, Fla. Stat. (2006) (providing for psychotherapist-patient privilege); § 90.5035, Fla. Stat. (2006) (providing for sexual assault counselor-victim privilege); § 90.5036, Fla. Stat. (2006) (providing for domestic violence advocate-victim privilege); § 90.504, Fla. Stat. (2006) (providing for husband-wife privilege); § 90.505, Fla. Stat. (2006) (providing for privilege with respect to communications to clergy); § 90.5055, Fla. Stat. (2006) (providing for accountant-client privilege); § 90.506, Fla. Stat. (2006) (privilege with respect to trade secrets); § 90.6063(7), Fla. Stat. (2006) (providing that where a deaf person communicates through an interpreter in circumstances where the communication would be privileged, the privilege applies to the interpreter as well); § 456.059, Fla. Stat. (2006) (providing the communications between a psychiatrist and patient are privileged); § 473.316, Fla. Stat. (2006) (providing that communications between an accountant and client are privileged); § 490.0147, Fla. Stat. (2006) (providing that communications between a licensed psychologist and client are privileged); § 491.0147, Fla. Stat. (2006) (providing that communications between persons licensed under chapter 491 and clients are privileged); § 766.1016, Fla. Stat. (2004) (providing for a "patient safety data privilege"); § 766.101, Fla. Stat. (2004) (providing immunity and a privilege from discovery for medical review committees). While some of the privileges here were first recognized by common law, such as the attorney-client privilege, these privileges have since been explicitly adopted by statute, and statutes can abrogate common law.