# Supreme Court of Florida

_____

No. SC15-1893
_____

**AMBER EDWARDS,**
Petitioner,

vs.

**LARRY D. THOMAS, M.D., et al.,**
Respondents.

[October 26, 2017]

LEWIS, J.

On November 2, 2004, the citizens of Florida voted to amend their constitution, adding in part the "right to have access to any records made or received in the course of business by a health care facility or provider relating to any adverse medical incident." Art. X, § 25(a), Fla. Const. This language was tested in the decision of the Second District Court of Appeal in Bartow HMA, LLC v. Edwards, 175 So. 3d 820 (Fla. 2d DCA 2015). Because the district court expressly construed a provision of the Florida Constitution, this Court has jurisdiction to review the decision. See art. V, § 3(b)(3), Fla. Const. We accept

that jurisdiction and analyze the significance of that constitutional provision in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

While in Florida, Amber Edwards developed stomach pain and was diagnosed with having gallstones. A laparoscopic cholecystectomy was scheduled and performed at Bartow Regional Medical Center (Bartow) on May 9, 2011. Bartow assigned Dr. Larry D. Thomas, M.D., to perform the surgery. During the procedure, Thomas failed to identify Edwards's common bile duct, cut her common bile duct during surgery, and failed to timely recognize that he had done so. After suffering from severe stomach pain for multiple days post-operation, Edwards returned to Bartow's emergency room, where Thomas's error was discovered. Upon discovering the severed common bile duct, Edwards was transferred to Tampa General Hospital for emergency corrective surgery.

Edwards ultimately sued Bartow and Thomas for medical negligence, including negligent hiring and retention. Edwards served a Request to Produce on Bartow on July 30, 2013, pursuant to article X, section 25 of the Florida Constitution, which is commonly referred to as Amendment 7, requesting a number of records relating to adverse medical incidents that occurred at Bartow. Bartow objected to the requested discovery, maintaining "that certain requested records did not relate to 'adverse medical incidents,' were not 'made or received in

- 2 -

the course of business,' were protected by attorney-client privilege, and were protected as opinion work product." Pet'r's Br. 3-4. Edwards then filed a motion to compel Bartow to file better responses, which the trial court granted, and Bartow again attempted to frustrate compliance with that court order by asserting the same objections and attaching privilege logs.

> In Privilege Log B at 15, 16, and 20, [Bartow] challenged specific reports "relating to attorney requested external peer review" and asserted that they were privileged. Edwards responded by filing a motion for rule to show cause or for an in camera inspection.
> The court conducted a hearing on the motion at which it clarified its prior ruling on [Bartow's] objections. The court explained that it had already determined that the documents in [Bartow's] privilege log were privileged. But it had also concluded that Amendment 7 preempted the privileges so that any documents relating to adverse medical incidents were discoverable. The court agreed to conduct an in camera inspection to determine if any of the documents in the privilege logs did not fall within the ambit of Amendment 7.
> After the in camera inspection, the court entered [an] order that . . . required the production of all documents related to [Bartow's] peer review of adverse medical incidents involving Dr. Thomas including the external peer review reports listed in Privilege Log B at 15, 16, and 20.

Edwards, 175 So. 3d at 823.

After being ordered on two occasions to produce the redacted documents that Edwards requested, Bartow then only provided Edwards with its internal peer review documents and filed a petition for writ of certiorari in the Second District Court of Appeal challenging the trial court's order requiring the production of the

- 3 -

external peer review reports at issue, which had been reviewed by the external

company, M.D. Review.  See id.

The Second District granted Bartow's petition and quashed, in part, the trial

court's order on the basis that the external reports were not "made or received in

the course of business" per Amendment 7's requirements and that they did not

relate to an "adverse medical incident."  Id. at 824-26.  Specifically, the district

court examined the meaning of "made or received in the course of business" and

concluded that because records created by an expert retained for the purposes of

any litigation are not kept in the regular course of business, the external peer

review reports were not "made or received in the course of business" for the

purposes of Amendment 7.  Id. at 824-25.  Moreover, the Second District, in

addressing whether the reports at issue related to adverse medical incidents,

reasoned that M.D. Review does not perform a routine function of reviewing all

adverse medical incidents for Bartow when medical negligence or other events

occur as specified in Amendment 7.  Id. at 825.  The peer review provided an

expert opinion on the standards of care from time to time when requested on

sporadic occasions when litigation appeared to be imminent.  Id. at 825-26.  Thus,

the court concluded that the reports at issue were not part of Bartow's regular or

routine peer review process and, accordingly, did not fall within the ambit of

Amendment 7.  Id. at 826.  Since the trial court had previously determined that

these reports were privileged, the Second District concluded that they were protected from discovery.  Id.

Given its conclusion, the Second District did not fully address Edwards's argument that "Amendment 7 preempts the common law attorney-client and work-product privileges."  Id.  It did, however, briefly note that, "while no appellate court has ruled on the issue of whether Amendment 7 preempts the attorney-client privilege, [the Second District] has noted that there has been a suggestion to that effect."  Id. (citing Bartow HMA, LLC v. Kirkland, 126 So. 3d 1247, 1253 (Fla. 2d DCA 2013); Morton Plant Hosp. Ass'n v. Shahbas ex rel. Shahbas, 960 So. 2d 820, 825 (Fla. 2d DCA 2007)).

Edwards petitioned this Court to review the Second District's decision based on its express construction of a constitutional provision.[1]  This review follows.

**Amendment 7**

The language of article X, section 25 of the Florida Constitution states in full:

> (a)  In addition to any other similar rights provided herein or by general law, patients have a right to have access to any records made or received in the course of business by a health care facility or provider relating to any adverse medical incident.

---

1. Edwards also petitioned this Court for review, alleging that the Second District's decision below conflicts with the decision of the Fifth District in Florida Eye Clinic, P.A. v. Gmach, 14 So. 3d 1044 (Fla. 5th DCA 2009).  See art. V, § 3(b)(3), Fla. Const.

- 5 -

(b)  In providing such access, the identity of patients involved in the incidents shall not be disclosed, and any privacy restrictions imposed by federal law shall be maintained.

(c)  For purposes of this section, the following terms have the following meanings:

(1)  The phrases "health care facility" and "health care provider" have the meaning given in general law related to a patient's rights and responsibilities.

(2)  The term "patient" means an individual who has sought, is seeking, is undergoing, or has undergone care or treatment in a health care facility or by a health care provider.

(3)  The phrase "adverse medical incident" means medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.

(4)  The phrase "have access to any records" means, in addition to any other procedure for producing such records provided by general law, making the records available for inspection and copying upon formal or informal request by the patient or a representative of the patient, provided that current records which have been made publicly available by publication or on the Internet may be "provided" by reference to the location at which the records are publicly available.

Art. X, § 25, Fla. Const. (emphasis added).  We recently explained that "the purpose of Amendment 7 'was to do away with the legislative restrictions on a Florida patient's access to a medical provider's "history of acts, neglects, or

defaults" because such history "may be important to a patient." ' "  Charles v. S.

Baptist Hosp. of Fla., Inc., 209 So. 3d 1199, 1204 (Fla. 2017) (quoting Fla. Hosp.

Waterman, Inc. v. Buster (Buster), 984 So. 2d 478, 488 (Fla. 2008)) cert. denied,

2017 WL 2444641 (Oct. 2, 2017).[2]

Moreover, we have also previously discussed the impact of Amendment 7's

passage, relying on Judge Sawaya's concluding comments in Florida Hospital

Waterman, Inc. v. Buster (Buster II), 932 So. 2d 344 (Fla. 5th DCA 2006):

> We believe that Amendment 7 heralds a change in the public
> policy of this state to lift the shroud of privilege and confidentiality in
> order to foster disclosure of information that will allow patients to

---

2.  Indeed, Amendment 7's creation was spurred by the citizens' frustration with the longstanding legislative protection of the medical community with regard to medical malpractice.

> Viewed from a historical perspective, Amendment 7 arose from
> a decades-long battle between doctors, insurance companies, and tort
> reformers on the one hand, and trial lawyers, patients' rights
> advocates, and civil justice proponents on the other, over tort reform
> legislation and efforts by the medical-insurance complex to curtail, if
> not eliminate, medical malpractice claims entirely.  Stoked, in part, by
> a well-coordinated campaign carried out by Floridians for Patient
> Protection, its passage came to symbolize the public's long-simmering
> frustration over a perceived "protect our own" mentality perpetuated
> by the medical profession's efforts to shield from public scrutiny even
> the most dangerous doctors and hospitals.  In the public's view,
> allowing the medical profession to continue to monitor itself, while
> hiding behind a veil of secrecy, had over time become like the
> proverbial fox guarding the hen house.

J.B. Harris, Riding the Red Rocket: Amendment 7 and the End to Discovery Immunity of Adverse Medical Incidents in the State of Florida, 83 Fla. B.J. 20, 20 (2009) (footnotes omitted).

better determine from whom they should seek health care, evaluate the quality and fitness of health care providers currently rendering service to them, and allow them access to information gathered through the self-policing processes during the discovery period of litigation filed by injured patients or the estates of deceased patients against their health care providers. We have come to this conclusion because we are obliged to interpret and apply Amendment 7 in accord with the intention of the people of this state who enacted it, and we have done so. . . .

Hence, what the Legislature has given through its enactments and the courts have enforced through their decisions, the people can take away through the amendment process to our state constitution. Moreover, what the people provide in their constitution, the Legislature and the courts may not take away through subsequent legislation or decision.

Buster, 984 So. 2d at 494 (quoting Buster II, 932 So. 2d at 355-56). Despite Judge Sawaya's wise words about Florida's constitutional amendment process, we knew from the outset that attempts would be made to whittle away at Amendment 7's broad scope, thus attempting to deprive the citizens of Florida of the rights they specifically voted to include in their state constitution.[3]

_____

3. Indeed, legal commentators have anticipated and discussed attempts to circumvent Amendment 7:

[G]oing forward, the two most significant challenges to Amendment 7 will remain 1) attempts by health care providers and facilities to limit through assertions of the attorney-client privilege, or work product doctrine, the operation of the amendment in response to discovery requests; and 2) charges of federal preemption.

Regarding the first challenge, in an effort to expand the reach of both attorney-client and work product protections, so as to restrict the operation of the amendment, risk managers have been instructing health care providers and facilities throughout the state how to immunize from discovery minutes, records, reports, and other

- 8 -

## ANALYSIS

### Amendment 7's Scope

We must first determine the intended scope of Amendment 7's reach. The Second District asserts, and Bartow naturally agrees, that Amendment 7 was only intended to abrogate the specific <u>statutory</u> limitations on discovery of adverse medical incidents that were in place prior to the amendment's passage in 2004. <u>Edwards</u>, 175 So. 3d at 824. Edwards, on the other hand, maintains that the intent of the Florida voters was to do away with <u>all</u> limitations on the discovery of adverse medical incidents. To properly address this issue, we look to both the language of the provision itself and the manner in which courts across the State of Florida have interpreted and applied Amendment 7.

> Statutory and constitutional construction are questions of law subject to a de novo review. <u>See</u> <u>Zingale v. Powell</u>, 885 So. 2d 277, 280 (Fla. 2004) ("[C]onstitutional interpretation, like statutory interpretation, is performed de novo."). The polestar of a statutory construction analysis is legislative intent. <u>See</u> <u>Borden v. East–European Ins. Co.</u>, 921 So. 2d 587, 595 (Fla. 2006). To discern legislative intent, this Court looks first to the plain and obvious meaning of the statute's text, which a court may discern from a dictionary. <u>See</u> <u>Rollins v. Pizzarelli</u>, 761 So. 2d 294, 297-98 (Fla.

---

> information generated by peer review, credentialing, investigations, quality assurance, and risk assessment committees, by having present at such meetings an attorney or attorneys who may later claim the attorney-client privilege or work product protection in order to circumvent the amendment's operation.

Harris, <u>supra</u> note 2, at 26 (footnotes omitted).

2000). If that language is clear and unambiguous and conveys a clear and definite meaning, this Court will apply that unequivocal meaning and not resort to the rules of statutory interpretation and construction. See Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984). If, however, an ambiguity exists, this Court should look to the rules of statutory construction to help interpret legislative intent, which may include the examination of a statute's legislative history and the purpose behind its enactment. See, e.g., Gulfstream Park Racing Ass'n v. Tampa Bay Downs, Inc., 948 So. 2d 599, 606-07 (Fla. 2006).

Similarly, when this Court construes a constitutional provision, it will follow construction principles that parallel those of statutory interpretation. See Ford v. Browning, 992 So. 2d 132, 136 (Fla. 2008) (quoting Zingale v. Powell, 885 So. 2d 277, 282 (Fla. 2004)). As with statutory construction, a question with regard to the meaning of a constitutional provision must begin with the examination of that provision's explicit language. See id. If that language is "clear, unambiguous, and addresses the matter at issue," it is enforced as written. Id. If, however, the provision's language is ambiguous or does not address the exact issue, a court "must endeavor to construe the constitutional provision in a manner consistent with the intent of the framers and the voters." Id.

W. Fla. Reg'l Med. Ctr., Inc. v. See, 79 So. 3d 1, 8-9 (Fla. 2012). "The importance of ascertaining and abiding by the intent of the framers was emphasized, so that 'a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.' " Buster, 984 So. 2d at 486 (quoting Gray v. Bryant, 125 So. 2d 846, 852 (Fla. 1960)).

First, the language of Amendment 7 provides that "patients have a right to have access to any records made or received in the course of business by a health care facility or provider relating to any adverse medical incident." Art. X, § 25(a), Fla. Const. (emphasis added). As stated above, when interpreting a constitutional

- 10 -

provision, we must look at the plain language of the provision.  See Rollins, 761

So. 2d at 297.  Tellingly, the language in Amendment 7 contains no limitation on

the types of adverse medical incident reports that are now discoverable.[4]  There is

also no qualifying provision in Amendment 7 that limits the scope of discoverable

records to those previously barred by the Legislature and this Court will not read

language into Amendment 7 that was not expressly included.  Instead, we apply the

unequivocal meaning of the plain language in Amendment 7, because "that

language is clear and unambiguous and conveys a clear and definite meaning."

See, 79 So. 3d at 9 (citing Holly, 450 So. 2d at 219).  Additionally,

> Statutory interpretation is a "holistic endeavor," and when engaged in
> the task of discerning the meaning of a statute, we " 'will not look

---

4.  In fact, in determining the applicability of Amendment 7 to adverse
medical incident records created before the amendment's passage, we specifically
noted the intentionally broad language of Amendment 7:

> Here, the plain language of the amendment permits patients to access
> any record relating to any adverse medical incident . . . .  The use of
> the word "any" to define the scope of discoverable records relating to
> adverse medical incidents . . . expresses a clear intent that the records
> subject to disclosure include those created prior to the effective date
> of the amendment.

Buster, 984 So. 2d at 487 (quoting Notami Hosp. of Fla., Inc. v. Bowen, 927 So. 2d
139, 145 (Fla. 1st DCA 2006), aff'd sub nom. Buster, 984 So. 2d 478) (emphasis in
original).  While Amendment 7's intentionally broad construction was being
discussed in terms of its applicability to records created before the amendment's
passage, this language nonetheless sheds light on the issue before the Court today.
The use of "any record" relating to "any adverse medical incident" expresses a
clear intent to abrogate any and all previously-existing restrictions on the
discoverability of these types of records.

- 11 -

merely to a particular clause in which general words may be used, but will take in connection with it the whole statute. . . .' " Adverting to our catalogue of rules of statutory construction,

> [w]e are required to give effect to "every word, phrase, sentence, and part of the statute, if possible, and words in a statute should not be construed as mere surplusage." Moreover, "a basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless." "[R]elated statutory provisions must be read together to achieve a consistent whole, and . . . '[w]here possible, courts must give full effect to all statutory provisions and construe related statutory provisions in harmony with one another.' "

Goode v. State, 39 So. 461, 463 (1905) ("It is the general rule, in construing statutes, 'that construction is favored which gives effect to every clause and every part of the statute, thus producing a consistent and harmonious whole. A construction which would leave without effect any part of the language used should be rejected, if an interpretation can be found which will give it effect.' ").

Quarantello v. Leroy, 977 So. 2d 648, 651-52 (Fla. 5th DCA 2008) (some citations

omitted).

We also note the plain language contained in Amendment 7's definition of

an "adverse medical incident."[5] Namely, the language "including, but not limited

_____

5. Amendment 7 defines the phrase "adverse medical incident" to mean

medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents

- 12 -

to, those incidents that are required by state or federal law to be reported to any governmental agency or body" provides meaningful context as to Amendment 7's intended broad application. Rather than shed light on Bartow's and the Second District's assertion that Amendment 7 was only intended to eliminate previously statutorily-protected adverse medical incident reports, this language actually reinforces the opposite conclusion. Bartow voices the assertion, "The previously protected records were ones that the statutes required a facility's own risk management programs or internal review and quality assurance committees to create as a condition of licensure." Answer Br. at 15. It is only these "previously protected records," Bartow maintains, that were intended to become discoverable after Amendment 7's enactment.

Reading Amendment 7's language as a whole, and taking into account the definition of an "adverse medical incident," however, suggests that the newfound right to access "<u>any record</u>" under Amendment 7 relating to "<u>any</u> adverse medical incident" necessarily includes, <u>but is not limited to</u>, those adverse medical incident records required to be reported by state or federal law. Bartow's and the Second

---

that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.

Art. X, § 25(c)(3), Fla. Const. (emphasis added).

District's interpretation of Amendment 7's scope, on the other hand, would render the language of "including, <u>but not limited to</u>," as "mere surplusage"—a result that is directly contrary to the rules of statutory and constitutional construction in this State. See <u>Quarantello</u>, 977 So. 2d at 651-52. Thus, it could not have been the intent of the Florida voters to enact Amendment 7 with such broadly-worded language, while simultaneously extremely limiting its scope and application only to those records previously protected under the licensing statutes. Therefore, we hold that Amendment 7's application was not intended to be limited only to those adverse medical incident records previously protected by statute.

Furthermore, examining the manner in which courts across the State have addressed the scope of Amendment 7 sheds light on its application in the present case. Most notably, our decision in <u>Buster</u> has been at the center of discussions relating to Amendment 7. Although generally addressing different issues than those before the Court today, the language and analysis set forth in <u>Buster</u> help guide the Amendment 7 analysis in this case.

As we explained in <u>Buster</u>:

> [T]he chief purpose of amendment 7 was to do away with the legislative restrictions on a Florida patient's access to a medical provider's "history of acts, neglects, or defaults" because such history "may be important to a patient." In other words, while this history was not previously accessible, it became accessible when the electorate approved a constitutional override of the prior statutory restrictions. The central focus of the amendment was to provide access to records that existed but were not accessible due to statutory

- 14 -

restrictions.  The language of the amendment could hardly have been
more specific or articulate in expressing the intent that what was not
accessible before would be accessible with the passage of the
amendment.

Similarly, the ballot summary for the amendment reflects that
the amendment's clear purpose was to do away with existing
restrictions on a patient's right to access a medical provider's history
of adverse medical incidents and to provide a clear path to access
those records.

. . . .

The ballot summary, like the text of the amendment itself, clearly
expressed an intent to do away with then current Florida law
restricting access to this information and would lead voters to the
conclusion that <u>all records,</u> including existing records, would
henceforth be subject to patient review.  The summary indicates that,
with the passage of the amendment, there would no longer be <u>any</u>
<u>legal barrier</u> to obtaining this information and that a patient, the day
after this amendment passed, would have access to this important
information of a provider's past record.

<u>Buster</u>, 984 So. 2d at 488-89 (emphasis added) (citations omitted).

In addition, in <u>Buster</u>, we specifically noted that the statutory restrictions

constituted only one barrier at issue with regard to production of this information

and the constitutional provision resulted in removing that obstacle to access.  <u>Id.</u> at

489.  Thus, our explanation in <u>Buster</u> that the passage of Amendment 7 was a

related result of the pre-existing statutory protections on the discoverability of

adverse medical incident reports is not the be all and end all in this analysis; rather,

it was one of the most apparent and significant obstacles to adverse medical

incident discovery in place at the time.  It does not necessarily follow, however,

- 15 -

that Amendment 7's scope was thus limited only to discovery of adverse medical incident reports previously protected by statute.

Since Buster, courts across the State have reiterated the statements contained therein, and have commented on a patient's right to access these Amendment 7 adverse medical incident reports. See Baldwin v. Shands Teaching Hosp. & Clinics, Inc., 45 So. 3d 118, 123 (Fla. 1st DCA 2010) ("The Florida Supreme Court has recognized that this popularly adopted amendment affects, or even abrogates, statutes that previously exempted records of investigations, proceedings, and records of peer review panels from discovery in civil or administrative actions."); Lakeland Reg'l Med. Ctr. v. Neely ex rel. Neely, 8 So. 3d 1268, 1270 (Fla. 2d DCA 2009) ("As broadly construed by the court in Buster, Amendment 7 'remove[s] any barrier to a patient's discovery of adverse medical incident information, including the peer review protections provided by the statute.' " (alteration in original) (emphasis added)); Columbia Hosp. Corp. of S. Broward v. Fain, 16 So. 3d 236, 240 (Fla. 4th DCA 2009) ("The purpose of Amendment 7 was to lift the shroud of secrecy from records of adverse medical incidents and make them widely available. . . .  A request for Amendment 7 materials is not an ordinary discovery request which can be subjected to overbreadth, irrelevance, or burdensomeness objections.  Pursuant to the amendment, a 'patient' has the absolute right to discover records relating to any adverse medical incident and that

right is not conditioned on the discovery being relevant to a pending claim." (emphasis added)); See, 79 So. 3d at 15 ("[Limiting disclosure of adverse medical incidents] conflicts with Amendment 7's definition of adverse medical incidents, which does not place a boundary on matters to be disclosed to patients."); Gmach, 14 So. 3d at 1050 ("In approving amendment 7, the citizens of Florida have demonstrated their conclusion that a patient's right to obtain records made in the course of business by a health care provider is a more important consideration than the chilling effect created by the potential public disclosure of those records."); see also See, 79 So. 3d at 14 ("[The Hospital's] argument that pursuant to [section 381.028(7)(b)1., Florida Statutes,] it must provide only certain reports . . . is expressly contrary to the amendment.  The amendment provides that it is 'not limited to' incidents that already must be reported under law." (emphasis in original) (quoting Fain, 16 So. 3d at 241)); Buster, 984 So. 2d at 489 ("Indeed, in our opinion approving placement of the amendment of [sic] the ballot we concluded that it 'creates a broader right to know about adverse medical incidents than currently exists.' ").  While some courts have continued to reiterate the Amendment's purpose as abrogating pre-existing statutory limitations on adverse medical incident discovery, others have referred to the constitutional right created by Amendment 7 as an "absolute right," Fain, 16 So. 3d at 240 (emphasis added),

- 17 -

aimed at eliminating "<u>any</u> legal barrier to obtaining this information," <u>Buster</u>, 984 So. 2d at 489 (emphasis added).

Thus, while in our opinion in <u>Buster</u> we explained one of the chief purposes of Amendment 7 as being aimed at eliminating prior statutory restrictions on adverse medical incident discovery, we did not do so in a way that limited the right created by the amendment. The prior statutory protections served only as an explanation for Amendment 7's genesis, rather than a limitation on the amendment's broad application. Moreover, in the cases since <u>Buster</u>, many courts have expanded upon <u>Buster</u>'s explanation by interpreting the amendment's right as an absolute right to review adverse medical incident reports. Therefore, as the plain language of the amendment mandates, we hold that Amendment 7 was aimed at eliminating <u>all</u> discovery restrictions on "<u>any</u> records . . . relating to <u>any</u> adverse medical incident." Art. X, § 25(a), Fla. Const. (emphasis added).

**Adverse Medical Incident Reports**

Next, we address whether the external peer review reports at issue here contain information on adverse medical incidents that fall within the purview of Amendment 7—namely, by determining whether the external peer review committee itself constitutes a "similar committee" as enunciated in the constitutional provision. Amendment 7 defines the phrase "adverse medical incident" to mean

medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, <u>including, but not limited to</u>, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by <u>any</u> health care facility peer review, risk management, quality assurance, credentials, <u>or similar committee, or any representative of any such committees.</u>

Art. X, § 25(c)(3), Fla. Const. (emphasis added).

The Second District determined that the reports at issue were not created by a "similar committee," as contemplated by the language in Amendment 7, noting the distinction discussed in <u>Neely</u> "between incident reports prepared in accordance with Florida Statutes and those 'documents prepared or produced at the specific request of the client's attorney for use in litigation.' " <u>Edwards</u>, 175 So. 3d at 826 (quoting <u>Neely</u>, 8 So. 3d at 1270 n.2). This distinction, however, necessarily presumes that Amendment 7's application was intended only to reach those records previously protected by the Legislature before the amendment's passage—a presumption that, as explained above, we find to be erroneous. Importantly, Bartow concedes that the reports at issue do, in fact, contain information relating to adverse medical incidents, but nonetheless asserts that they are not the types of reports contemplated by Amendment 7 because they were not made pursuant to Bartow's statutory reporting obligations. Conversely, Edwards maintains that the external peer review committee that reviewed the reports at issue is the exact type of "similar committee" referenced in Amendment 7.

We must again employ the rules of statutory and constitutional construction in answering this question. First, in looking to the plain language quoted above, it must be noted again that the language of Amendment 7 contains <u>no limitation</u> on the definition of "adverse medical incidents" based on a health care facility's statutory reporting obligations.

In fact, as discussed above, the phrase "including, but not limited to" when referencing the reports required by state or federal law to be reported requires a directly contrary meaning. Furthermore, reading the entire provision logically, directly mentioning reports generated pursuant to state or federal law presumes that these reports are generated by statutorily-mandated risk management committees. The provision then goes on to <u>expressly include</u> an additional and entirely separate category of incidents—namely, those "that are reported to or reviewed by <u>any</u> health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees." Art. X, § 25(c)(3), Fla. Const. (emphasis added). Presumably, reading the provision as written in its entirety, the incident reports generated pursuant to state or federal law (which are incident reports generated pursuant to statutorily-mandated internal risk management or peer review committees) are a different category of reports from those created by any similar health care facility committee. Moreover, we often apply rules of grammar during our constitutional construction to determine the

drafters' intent.  See State v. Bodden, 877 So. 2d 680, 685-86 (Fla. 2004).  By making the language in this provision two separate clauses, the drafters of Amendment 7 signaled that these two clauses were intended to be read disjunctively.

Bartow and the Second District, however, read this provision to require only the production of incident reports generated pursuant to the statutory reporting obligations.  This reading seemingly conflates the reports generated pursuant to a statutory obligation and those other reports generated pursuant to any similar health care facility committee.  Rather than give the entire provision a reasonable and logical meaning, Bartow and the Second District's interpretation renders the language in the provision concerning incidents generated in accordance with state or federal law meaningless because it presumes that the second half of the language in the provision, including any "similar committees," refers only to those same statutorily-mandated committees.  See Quarantello, 977 So. 2d at 651-52 (stating that a statutory interpretation cannot render portions of the provision meaningless or "mere surplusage").

Additionally, as with the use of "any records" relating to "any adverse medical incident," the provision defining "adverse medical incident" also contains similarly broad wording with regard to the incidents reviewed by health care facility committees.  See art. X, § 25(c)(3), Fla. Const. ("[A]nd incidents that are

- 21 -

reported to or reviewed by <u>any</u> health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees." (emphasis added)).  Rather than limiting its application, the use of "any" repeatedly throughout the language of Amendment 7 yet again indicates its broadly designed and intended nature.  There is no mention in the provision of its applicability only to "any internal" committee or to "any statutorily-mandated" committee, and this Court will not read that language into Amendment 7.  Therefore, we conclude that the committees specifically listed in article X, section 25(c)(3) of the Florida Constitution are not limited only to those required by a statutory obligation.

The meaning of "similar committees" is both clear and unambiguous as we delve further into the rules of constitutional analysis to ascertain the intended meaning behind the phrase.  We conclude that the phrase "similar committees" was intended to apply to both risk management committees similar to those specifically listed, and also to those beyond what are statutorily required of health care facilities.

Tellingly, "[t]he Florida Legislature enacted these peer review statutes in an effort to control the escalating cost of health care by encouraging self-regulation by the medical profession through peer review and evaluation."  <u>Cruger v. Love</u>, 599 So. 2d 111, 113 (Fla. 1992).  These statutes, however, are the floor, rather than the

ceiling for health care facilities' self-regulation.  See § 395.0197(3), Fla. Stat. (2017) ("In addition to the programs mandated by this section, other innovative approaches intended to reduce the frequency and severity of medical malpractice and patient injury claims shall be encouraged and their implementation and operation facilitated.").  In addition to those required by statute, health care facilities can participate in and seek out additional voluntary committees and programs that provide additional resources on how to improve the quality of care rendered to patients.  Id.; see generally Charles, 209 So. 3d 1199 (discussing the Federal Patient Safety and Quality Improvement Act and how it relates to patients' rights under Amendment 7).  These additional programs and reviews cannot logically be excluded from Amendment 7's application simply because they are in addition to the base-level, statutorily-required risk management committees.  Such a result would be directly contrary to the intent and express words of Florida voters to have greater access to adverse medical incident records than they did before the passage of Amendment 7.  Moreover, the result asserted by Bartow would provide a trap door through which hospitals could totally avoid their discovery obligations by outsourcing their adverse medical incident reporting to external, voluntary risk management committees separate from those required by the Florida statutory scheme.

Therefore, we hold that, based on the express language and the principles of constitutional analysis, the external peer review committee at issue in this case does qualify as a "similar committee" under Amendment 7.

## "In the Course of Business" Requirement

Unlike "adverse medical incident," "in the course of business" in this context is not specifically defined in the text of Amendment 7, nor has it been interpreted in this context by any court in Florida to date. Nevertheless, Bartow contends, and the Second District agrees, that the external peer review reports at issue were not made "in the course of business" because they were not made pursuant to Bartow's statutory documentation and reporting requirements, but rather were requested in anticipation of litigation. Curiously, while the Second District did acknowledge that some records can be kept in the ordinary course of business, even absent any sort of statutory obligation, it nonetheless summarily concluded that the records at issue were not kept in the ordinary course of business because they were created by an expert retained in anticipation of litigation.[6] Edwards, 175 So. 3d at 825.

---

6. The entire dissent is predicated on a fundamental flaw that fails to acknowledge and apply that this entire constitutional provision as written as it relates to and is built upon an "adverse medical incident," which is inherent in all medical "litigation."

The only Florida case that provides some guidance on this issue is our recent decision in Charles.  At issue in Charles was whether records that a hospital created relating to adverse medical incidents, and thus falling within the ambit of Amendment 7, were rendered confidential and privileged simply because they were voluntarily submitted for review under the Federal Patient Safety and Quality Improvement Act ("the Federal Act").  Charles, 209 So. 3d at 1203.  In determining that the reports at issue were not protected, due to the hospital's independent obligation to maintain similar reports pursuant to Florida law, we explained,

> Florida has various statutes and rules, many of which pre-date the Federal Act, that require a health care provider to create and maintain adverse medical incident reports.  See § 395.0197(4)-(7), Fla. Stat. (2015) (requiring risk program that includes adverse incident reports); see also Fla. Admin. Code r. 59A-10.0055 (establishing risk management system to report adverse incidents to the Florida Agency for Health Care Administration).  Amendment 7 provides individuals the right to access "any records made or received in the course of business by a health care facility or provider relating to any adverse medical incident."  Art. X, § 25(a), Fla. Const.  In other words, health care providers are required by state law to keep adverse medical incident reports, and the right of patients to access those adverse medical incident reports is enshrined in Florida's Constitution.

> . . . .

> Simply put, adverse medical incident reports are not patient safety work product because Florida statutes and administrative rules require providers to create and maintain these records and Amendment 7 provides patients with a constitutional right to access these records. . . .  In addition, their disclosure fits squarely within the providers' recordkeeping obligations under state law.

- 25 -

Id. at 1211.

Specifically, we noted in Charles that the requested documents "were primarily adverse medical incident reports . . . [and the hospital] acknowledged that some of its occurrence reports would have been discoverable pursuant to that request, but for the Federal Act." Id. at 1216; see also id. at 1206 ("[The hospital] claimed that certain other documents, primarily occurrence reports, while potentially responsive because they were adverse incident reports, were not subject to production because they were privileged and confidential under the Federal Act as patient safety work product." (emphasis added)). Similarly, here Bartow concedes that the documents at issue relate to adverse medical incidents, but nonetheless attempts to shield them from discovery. However, much like the "occurrence reports" generated in Charles, Bartow's external peer review reports contain similar information about the adverse medical incidents as those they had an independent obligation to maintain through their internal risk management committees pursuant to Florida law.

> [T]he records do not become patient safety work product simply because they were placed in a patient safety evaluation system or submitted to a patient safety organization because providers have an independent obligation under Florida law to create and maintain them, and Amendment 7 provides patients with a constitutional right to access them. Consequently, adverse medical incident reports produced in conformity with state law and requested by patients under Amendment 7 cannot be classified as confidential and privileged patient safety work product under the Federal Act.

Id. at 1212 (citations omitted).  Here, the mere fact that Bartow voluntarily

outsourced its peer review needs also does not place the reports produced outside

or beyond the scope of Amendment 7's reach.  Any contrary conclusion would

provide hospitals with a blueprint as to the method to evade their constitutionally-

mandated discovery requirements.

> The Department of Health and Human Services explained how providers have been attempting to use the confidentiality and privilege provisions in the Federal Act to their advantage:
>
>> First, some providers with recordkeeping or record maintenance requirements appear to be maintaining the required records only in their [patient safety evaluation system] and then refusing to disclose the records, asserting that the records in their [patient safety evaluation system] fulfill the applicable regulatory requirements while at the same time maintaining that the records are privileged and confidential [patient safety work product].  Second, some providers appear to develop records to meet external obligations outside of the [patient safety evaluation system], place a duplicate copy of the required record into the [patient safety evaluation system], then destroy the original outside of the [patient safety evaluation system] and refuse to disclose the remaining copy of the information, asserting that the copy is confidential and privileged [patient safety work product].  The Patient Safety Act was not intended to give providers such methods to evade their regulatory obligations.

Id. at 1216 (alterations in original) (citing 81 Fed. Reg. 32,655-01, 32,657-58).

The concerns with regard to a hospital evading its reporting and discovery

obligations are not appeased in the situation before us today.  Rather, Bartow's

argument and the Second District's holding would provide yet another avenue by which hospitals could deprive the people of Florida of their constitutional right to review "<u>any</u> records . . . relating to <u>any</u> adverse medical incident."  Art. X, § 25(a), Fla. Const. (emphasis added).  Furthermore, the dissent would have the adverse medical incident discovery obligations that the people of Florida chose to include in their state constitution circumvented, simply based on the identity of the person requesting the peer review reports.  Under the dissent's view, any and all adverse medical incident reports, if requested by an attorney, rather than a hospital itself, would then be protected from discovery—thus rendering Amendment 7 a nullity.

Additionally, it is worth noting that if Bartow is statutorily required to maintain similar adverse medical incident records as the ones outsourced to the external peer review committee, then it is a logical conclusion that these sorts of reports are ones that are maintained in the ordinary course of business.  Part of a Florida hospital's day-to-day business is recording and addressing adverse medical incidents that might arise in daily operations, and responding to these adverse incidents in a way that will not only improve the quality of care rendered, but also prepare the hospital for any potential litigation that may arise from such an incident.[7]  <u>See</u> <u>Sandegren v. State ex rel. Sarasota Cty. Pub. Hosp. Bd.</u>, 397 So. 2d

_____

7. <u>See</u> 23 Fla. Jur. 2d Medical Records § 320 ("As with other forms of business records, medical records can be entered as evidence if made at or near the time by, or from information transmitted by, a person with knowledge; if kept in

- 28 -

657, 660 (Fla. 1981) (holding that an exhibit containing a compilation of dates, total charges, and payments from various sources for over one thousand Baker Act patients treated by the hospital over a period of time was admissible under the business records exception because "the underlying data upon which the questioned exhibit was based was prepared and kept in the regular course of business"); CF Chems., Inc. v. Fla. Dep't of Labor & Emp't Sec., 400 So. 2d 846, 848 (Fla. 2d DCA 1981) (holding that employee attendance records were made in the regular course of business, where such "records were regularly completed and maintained to protect [the employer] in the event an employee filed a grievance"); Jackson v. State, 877 So. 2d 816, 817-18 (Fla. 4th DCA 2004) (holding that

---

the course of a regularly conducted business activity; and if it was the regular practice of that business activity to make such memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the sources of the information or other circumstances show a lack of trustworthiness."); Charles W. Ehrhardt, Ehrhardt's Florida Evidence § 803.6, at 1076 (2017 ed.) ("Not only are records which are routinely and frequently made by the business admissible under section 90.803(6), the exception also includes non-routine records which are infrequently made but which are made by the business whenever an event occurs.[n.10]  If in response to an infrequent event, it is the regular practice of the business to make the record, the record is admissible.

[n.10] 4 Weinstein, Evidence § 803(6)[01] at 803-151 ('The test was not whether the particular type of record was being made routinely, but whether the record was made in conjunction with a routine, established, regular operation.')."); see generally § 395.0193, Fla. Stat. (2017) (requiring licensed health care facilities, as a condition of licensure, to maintain peer review processes); § 395.0197, Fla. Stat. (requiring that every licensed healthcare facility establish an internal risk management program).

records were admissible under the business records exception to the hearsay rule even though they were technically prepared in anticipation of litigation because they were nonetheless kept in the ordinary course of business). Thus, contrary to the dissent's assertion, maintaining records such as those produced by the external peer review committee would, in fact, be the type of reports that hospitals would maintain or receive in their course of business, even in the absence of any statutorily-mandated duty to do so.

Therefore, we conclude that the reports at issue here are the type that are "made or received in the course of business by a health care facility or provider." Art. X, § 25(a), Fla. Const.

## Work Product and Attorney-Client Privilege

Bartow also asserts that the external peer review reports at issue are protected from discovery under the work product privilege or, in the alternative, under the attorney-client privilege. "Work product can be divided into two categories: 'fact' work product (i.e., factual information which pertains to the client's case and is prepared or gathered in connection therewith), and 'opinion' work product (i.e., the attorney's mental impressions, conclusions, opinions, or theories concerning his client's case)." State v. Rabin, 495 So. 2d 257, 262 (Fla. 3d DCA 1986). However, as the Third District explained in Acevedo v. Doctors Hospital, Inc.,

> The plain language of Amendment 7 evinces intent to abrogate any fact work privilege that may have attached to adverse medical incident reports prior to its passage. See Fla. Eye Clinic, P.A. v. Gmach, 14 So. 3d 1044, 1048 (Fla. 5th DCA 2009) (ordering disclosure of incident reports prepared by the clinic's risk manager in accordance with Amendment 7); Fla. Hosp. Waterman, Inc. v. Buster, 984 So. 2d 478, 489 (Fla. 2008) (upholding the constitutionality of Amendment 7 and noting that it creates "a broader right to know about adverse medical incidents than currently exists"); Lakeland Reg'l Med. Ctr. v. Neely, 8 So. 3d 1268, 1270 (Fla. 2d DCA 2009) (finding no basis to except work product materials from the reach of Amendment 7 as interpreted by Buster).

68 So. 3d 949, 953 (Fla. 3d DCA 2011); see Kirkland, 126 So. 3d at 1253 ("Amendment 7 also preempts application of the work product doctrine to the extent it relates to fact work product." (emphasis in original)). Thus, to the extent that Bartow argues that the external peer review reports are protected fact work product, we disagree. The dissent would summarily conclude, as did the Second District, that these records are protected work product without differentiating between fact and opinion work product and without providing any legal justification for this conclusion. This conclusion, however, ignores the state-wide precedent finding fact work product to be within Amendment 7's reach. Moreover, if this conclusion finds the records to be opinion work product, it conveniently ignores the requirement that opinion work product contain the attorney's mental impressions, conclusions, opinions, or theories—which is not the case with the records at issue here. The dissent also fails to consider that any adverse medical incident generates investigatory responses, the results of which are

- 31 -

expressly covered by the constitutional provision. If merely having an attorney request records following an adverse medical incident cloaks the facts with secrecy, the express constitutional right is emasculated and ultimately erased.

However, based on the record before us today, we do not need to address the issue of opinion work product or the attorney-client privilege as they relate to Amendment 7. Here, there is no basis that opinions of counsel are involved, nor are communications between counsel and client presented. Therefore—here—to the extent that these reports contain any fact work product at all, we hold that Bartow's external peer review reports are discoverable under Amendment 7's broad reach.

**CONCLUSION**

Accordingly, we hold that the external peer review reports are discoverable under Amendment 7, and we quash the Second District's decision in Edwards.

It is so ordered.

LABARGA, C.J., and PARIENTE, and QUINCE, JJ., concur.
POLSTON, J., concurs in result.
LAWSON, J., dissents with an opinion, in which CANADY, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., dissenting.

Because the plain language of our constitution requires this Court to approve the Second District's decision shielding expert reports prepared in anticipation of

- 32 -

litigation—rather than in the course of business—from disclosure pursuant to Amendment 7, I respectfully dissent.

Amendment 7 provides in pertinent part that "patients have a right to have access to any <u>records made or received in the course of business</u> by a health care facility or provider relating to any adverse medical incident."  Art. X, § 25(a), Fla. Const. (emphasis added).  Work product prepared in anticipation of litigation is the antithesis of the "records made or received in the course of business" that fall within Amendment 7's ambit.  <u>See</u> <u>Progressive Am. Ins. Co. v. Lanier</u>, 800 So. 2d 689, 691 (Fla. 1st DCA 2001) (explaining that the work-product doctrine protects documents prepared "in anticipation of litigation, rather than in the ordinary course of . . . business"); <u>see also</u> § 381.028(3)(j), Fla. Stat. (2010) (defining "records" for purposes of legislation implementing Amendment 7 to exclude "documents or portions thereof which constitute, contain, or reflect any attorney-client communications or any attorney-client work product").

To reach the opposite conclusion—that the expert reports the hospital, through its counsel, obtained in anticipation of litigation in this case "are the type that are 'made or received in the course of business by a health care facility or provider,' " majority op. at 30 (quoting art. X, § 25(a), Fla. Const.)—the majority reasons that hospitals generally keep records of adverse medical incidents, so the reports at issue must have been prepared and received in the course of the

- 33 -

hospital's business. From there, the majority concludes that, even if the reports contain work product, they are nevertheless subject to disclosure under Amendment 7. The majority's circular reasoning, however, ignores the plain language of Amendment 7's "course of business" requirement, which is not satisfied on the facts of this case.

As the Second District explained below, the hospital's legal "counsel requested the reports at issue for purposes of litigation" from a company called M.D. Review that "does not perform the routine function of reviewing incidents for the [h]ospital when medical negligence or other events occur as specified in Amendment 7," but rather "provides an expert opinion on the standard of care on sporadic occasions when litigation is imminent." Bartow HMA, LLC v. Edwards, 175 So. 3d 820, 824-26 (Fla. 2d DCA 2015). There is no evidence that the hospital sought these expert opinions—which were not "part of [its] regular peer review process"—in an attempt to avoid the disclosure requirements of Amendment 7. Id. at 826. Rather, "[t]he [h]ospital satisfied [Amendment 7's] requirements by providing access to numerous documents pertaining to internal adverse incident reporting and peer review" and, in contrast, relied upon M.D. Review's reports for "an expert opinion on the standard of care" to prepare for "litigation [that was] imminent." Id. at 825-26. Accordingly, as the Second District correctly held, the reports at issue, which were "created by an expert retained for purposes of

- 34 -

litigation[,] are not kept in the course of regularly conducted business activity" and therefore "were not 'made or received in the course of business' under Amendment 7." Id. at 825.[8]

Moreover, while proper application of Amendment 7's "course of business" requirement is sufficient to end the inquiry, see Fla. League of Cities v. Smith, 607 So. 2d 397, 400 (Fla. 1992) ("[W]hen constitutional language is precise, its exact letter must be enforced . . . ."), Amendment 7's history underscores that it was not intended to destroy the work-product doctrine or the attorney-client privilege. Specifically, in approving Amendment 7 for placement on the ballot, this Court rejected the argument that Amendment 7 "would affect Florida Rule of Civil Procedure 1.280(c), which restricts the discovery of work product, including incident reports generated by health care providers and facilities . . . [and] infringes on the statutes and rules delineating the attorney-client privilege." Advisory Op. to

---

8. Contrary to the majority's assertion, I am not suggesting that a hospital can avoid Amendment 7's requirements by funneling requests for adverse medical incident investigations through an attorney or that a hospital can shield routine business records from discovery by providing them to an expert. What I am saying is where, as happened here, a hospital, through its attorney, seeks an expert opinion on whether the hospital satisfied the applicable standard of care for the express purpose of preparing for imminent litigation, that is not—at least not prior to today—making or receiving records "in the course of business." That is preparing work product in anticipation of litigation. And that is why, by its plain language, Amendment 7 does not apply to the reports prepared by M.D. Review, regardless of the specific type of work product those reports contain.

- 35 -

<u>Atty. Gen. re Patients' Right To Know About Adverse Med. Incidents</u>, 880 So. 2d 617, 621 (Fla. 2004). In so doing, this Court held that "the amendment does not expressly affect either rule 1.280(c) or the attorney-client privilege, and there is no evidence of any intent to do so." <u>Id.</u>

Applying Amendment 7's plain language consistently with this Court's holding regarding its intent, like the Second District, I would conclude that the expert reports at issue—prepared at the request of the hospital's counsel, outside of the ordinary peer review process, in anticipation of imminent litigation—are not "records made or received in the course of business" subject to disclosure pursuant to Amendment 7. The majority's contrary holding improperly reads the "course of business" language as superfluous and recasts the constitutional provision, without it, as providing for discovery of any records relating to adverse medical incidents with "no limitation[.]" Majority op. at 11. Therefore, I dissent.

CANADY, J., concurs.

Application for Review of the Decision of the District Court of Appeal – Constitutional Construction

      Second District – Case No. 2D14-3450

      (Polk County)

Kara Berard Rockenbach and Kristi Bergemann Rothell, Methe & Rockenbach, P.A., West Palm Beach, Florida;

      for Petitioner

Amy L. Dilday, McCumber, Daniels, Buntz Hartig & Puig, P.A., Tampa, Florida;

for Respondent